764 So.2d 511 (2000)
Charles Evers REED, Appellant,
v.
STATE of Mississippi, Appellee.
No. 1998-KA-01802-COA.
Court of Appeals of Mississippi.
August 8, 2000.
Dwayne G. Deer, McComb, Gus Grable Sermos, Summit, Attorneys for Appellant.
Office of the Attorney General by W. Glenn Watts, Attorney For Appellee.
BEFORE McMILLIN, C.J., LEE, AND THOMAS, JJ.
*512 LEE, J., for the Court:
¶ 1. Charles Evers Reed was tried for burglary and rape before a jury in the Adams County Circuit Court. He was found guilty of rape and sentenced to life as an habitual offender pursuant to the terms of Miss.Code Ann § 99-19-83. (Rev.1994), without the benefit of parole. It is from that conviction that he appeals to this Court, asserting as error that a mistrial should have been granted because of a prejudicial statement made by a witness while testifying at the trial. After a thorough review of the record, we have found no reversible error and affirm the lower court.

FACTS
¶ 2. L.R. testified that she was alone at her house asleep in the early morning hours on July 3, 1997, when she was awakened and saw a strange man coming toward her bed. She jumped up on the other side of the bed and asked him what he was doing in her house. She said that the light was on in her bathroom, and she was able to see his face at this time. He told her not to look at him and grabbed her. She struggled and resisted but said he was strong and had big arms, and she could not overcome his strength. He pushed her on the bed and put his arm on her back. She said she was lying on her stomach while he unsuccessfully tried to sodomize her prior to raping her by penetrating her vagina with his penis. L.R. said afterwards he picked up a pillow and she thought he was going to smother her. She asked him not to kill her and told him that she did not see him and would not tell anyone. He then told her to get in the closet. After staying in the closet awhile, she got out and locked her bedroom door and called the sheriffs office. The sheriffs office responded as well as the Natchez Police Department.
¶ 3. About 5:45 that morning, a neighbor of L. R.'s, Mrs. Cox, saw a man running down the street wearing dark pants and a tank top as she was getting her paper at the foot of her driveway. She later saw police cars down the street. When her husband told her there had been a rape, she told him about the man she had seen running. The police later took a statement from her, and she was able to identify the man she had seen running from a photo lineup. Mr. Cox said that he had seen this person riding a bicycle in the neighborhood several days before while he was painting his house and that he had made three or four trips riding up and down the street. Another neighbor saw a man of this description that same morning jump the fence and cut through her back yard. She noticed that he covered his face when he saw her looking at him from her window. Her suspicions led her to call the police, and she also gave a statement.
¶ 4. Meanwhile, a policeman in a marked car saw the suspect running through some woods, and the policeman fled on foot in pursuit. He was not, however, able to apprehend him. Reed eventually wound up at Natchez Auto Electric about 7 a.m. and asked the owner for a ride home. Though the owner did not take him home, Reed's cousin, a regular customer of the shop, drove up and gave him a ride home. The owner of the shop heard about the rape about 8 a.m. and realized that Reed fit the description of the suspect. He reported it to the police who later arrested Reed at his home.
¶ 5. Reed testified on his own behalf and was the only witness for the defense. He testified that he and L.R. had a consensual sexual relationship. He said that they had met at a casino and he had been with her on more than twenty occasions. He said that they frequented local motels for sex and that he had been to her house several times. He said that they had been together the night before the incident and that he had gone to her house on his mountain bike at 4:30 on the morning of the incident. He said that he rang the doorbell and she let him in. Reed explained that they had sex and that the scratches on his back were the result of passionate lovemaking. *513 After they had sex, he said L.R. told him that her boyfriend found out that she was seeing a black man. Reed told her he would leave, and she responded that he would be sorry. Reed said he panicked and started jogging away and left his bicycle there.
¶ 6. The investigation at L. R.'s house showed Reed's fingerprints on a screen that had been removed from the rear kitchen window. In addition, the keys to his house and post office box were found in L. R.'s bedroom. There was no bicycle found at L. R.'s house; however, one was found down the street. Reed denied that it was his and an owner was never identified. A rape kit was done on L. R., and it was determined that the DNA taken from vaginal swabs matched Reed's semen sample. Blood was found in fingernail scrapings taken from L.R. When police arrested Reed at his apartment, a plastic bag was found tacked underneath the staircase containing wet dark pants and a tank top matching the description they had been given of the suspect's clothing.

ISSUE AND DISCUSSION

DID THE TRIAL COURT ERR IN DENYING A MISTRIAL WHEN A WITNESS MADE A STATEMENT REGARDING A PRIOR SEXUAL OFFENSE?
¶ 7. The Uniform Rules of Circuit and County Court Practice, Rule 3.12 allows the judge to declare a mistrial only when the harm done would render the defendant without hope of receiving a fair trial. Roundtree v. State, 568 So.2d 1173, 1178 (Miss.1990).
¶ 8. Reed asserts that the trial court erred in failing to declare a mistrial on its own motion because of a prejudicial statement made by a primary prosecution witness, Officer Butler, the Natchez Police Department crime scene investigator. The relevant colloquy is as follows:
BY MR. SMITH (Prosecutor):
Q. Officer Butler, did you have occasion to collect evidence from [the victim] and from the defendant for purposes of serology DNA analysis?
A. Yes, sir. A sexual assault kit was done on [the victim] that evening or that morning when she was brought to the hospital immediately after the incident. I believe Mr. Reed was taken to the hospital later on to get blood drawn.
Q. Was that doneare you able to just draw blood from a defendant at will or do you need permission to do that?
A. It is my understanding that the suspect previously convicted for a sexual offense
Q. Well, excuse me
BY THE COURT: Just a moment.
Q. just a moment.
A. Pardon me?
Q. We're not talking about in general aboutwe're talking about something
BY THE COURT: All right, ladies and gentlemen, this casethe witness was talking about something in general there; there is no implication of any prior sexual assault. Would you please disregard what the witness has said. If you would, please raise your hand?
If you can disregardthe witness said something about a sexual assault; that was notthat is not the case or not something that you are to consider; if you can disregard that statement, please raise your hand.
Did everybody raise their hand? I'm trying
The record then reflected that there was a unanimous show of hands.
¶ 9. Though the record shows that Reed made no contemporaneous objection to the unresponsive statement made by Officer Butler, which this Court requires to be made in a timely manner to preserve the issue for appeal, Lambert v. State, 518 *514 So.2d 621, 625 (Miss.1987), Reed argues that the trial judge should have declared a mistrial sua sponte in reliance on the "manifest necessity" rule enumerated in Spann v. State, 557 So.2d 530, 532 (Miss. 1990). In that case, a mistrial was granted sua sponte while the defendant was testifying when his wife shouted derogatory comments from the gallery at him regarding his truthfulness. Id. at 532. The court concluded that there was no way for the jury to continue without being prejudiced. In that trial, other witnesses had shown a lack of decorum and had been admonished; however, it was the wife's outburst that was cited as the incident that finally triggered the mistrial. Id. at 531.
¶ 10. Whether the "manifest necessity" standard has been met turns on the facts and circumstances of each case. Watts v. State, 492 So.2d 1281, 1284 (Miss. 1986). The supreme court has recognized several examples where a declaration of a mistrial would likely be a manifest necessity: failure of a jury to agree on a verdict; a biased or otherwise tainted jury; improper separation of the jury; where jurors showed an unwillingness to follow the court's instructions. Watts v. State, 492 So.2d 1281, 1284 (Miss.1986). The question here is whether the jury was biased or tainted beyond cure as a result of Butler's comment. Hoops v. State, 681 So.2d 521, 528 (Miss.1996). We do not find that the comment rose to the level requiring that a sua sponte mistrial should have been granted as it was in Spann, and therefore find no merit to this argument.
¶ 11. Reed argues that the trial court erred in not granting his motion for a mistrial, claiming that the court's admonishment to the jury to disregard the prejudicial comment could not be successfully accomplished. He claims that there were unusual circumstances preventing proper jury admonishment. Lenox v. State, 727 So.2d 753 (¶ 26) (Miss.Ct.App.1998). The unusual circumstances to which he refers is the consensual relationship he claims to have had with L.R. which was his defense. He claims that a comment regarding a prior sexual offense predisposed the jury to find him guilty in the instant case. Whether a consensual relationship existed is a question of fact for the jury which rested on Reed's credibility, or incredibility, as a witness on his own behalf and is not a basis upon which a mistrial is granted.
¶ 12. Nevertheless, a mistrial is not the inevitable result every time the jury is permitted to hear inadmissible evidence. The trial court is in the best position to assess the prejudicial impact of the improper evidence and decide whether a mistrial is necessary or whether the prejudice can be cured by admonishing the jury to disregard it. Reynolds v. State, 585 So.2d 753, 755 (Miss.1991). In Hoops, a testifying witness unexpectedly referred to prior aggravated assaults committed by the defendant. Hoops, 681 So.2d at 528. No reversible error was found where the trial judge denied defense counsel's motion for a mistrial and instructed the jury to disregard the prejudicial statement. Id. at 529.
¶ 13. We do not find the statement made by Officer Butler to be any more prejudicial than the statement in Hoops. In this case it is not clear what Officer Butler was trying to say; however, the witness was immediately cutoff from further testimony and the jury was instructed by the trial court to disregard the testimony. The trial judge not only admonished the jury to disregard the impermissible statement but also asked for a show of hands from the jury to ensure a fair trial. The jurors indicated their unanimous ability to deliberate the case as instructed. The trial court, viewing the matter firsthand, was apparently satisfied that this was sufficient to minimize any prejudice to the defendant, and there is nothing in the record that demonstrates the trial court was manifestly wrong in its assessment. It is presumed that jurors follow the instructions of the court. Payne v. State, *515 462 So.2d 902, 904 (Miss.1984). If we were to presume otherwise, it would mean our jury system was inoperable. Johnson v. State, 475 So.2d 1136, 1142 (Miss.1985).
¶ 14. The trial judge took appropriate measures to remedy Butler's statement; consequently, we find no error in the denial of Reed's motion for mistrial.
¶ 15. THE JUDGMENT OF THE AMITE COUNTY CIRCUIT COURT ON CHANGE OF VENUE FROM ADAMS COUNTY OF CONVICTION OF RAPE AND SENTENCE TO LIFE IMPRISONMENT IS AFFIRMED. SENTENCE SHALL NOT BE REDUCED OR SUSPENDED NOR SHALL APPELLANT BE ELIGIBLE FOR PAROLE OR PROBATION. ALL COSTS OF THIS APPEAL ARE ASSESSED TO ADAMS COUNTY.
McMILLIN, C.J., KING AND SOUTHWICK, P.JJ., BRIDGES, IRVING, MOORE, PAYNE, AND THOMAS, JJ., CONCUR. MYERS, J., NOT PARTICIPATING.