[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 543 
¶ 1. Yolanda Fay Williams was indicted in Washington County for the murder of Robert Brown A jury found Williams guilty of the lesser charge of manslaughter. The circuit court sentenced Williams to fifteen years in the custody of the Mississippi Department of Corrections. She appeals, arguing the following issues:
 (1) Whether the trial court erred in refusing to grant her motions for directed verdict and for judgment not withstanding the verdict when the Weathersby
Rule applies to this case.
 (2) Whether Williams's conviction should be reversed when she was unjustly prejudiced by the State's multiple acts of prosecutorial misconduct and the jury's decision was influenced by the prejudice.
 ¶ 2. Finding no error, we affirm.
 FACTS ¶ 3. The evidence is undisputed that Yolanda Williams shot and killed Robert Brown, her lover and the father of her unborn child, on October 14, 2003. Williams fired a .25 caliber pistol at close range. The bullet struck Brown in the back of the left forearm, traveled through his forearm and into the left side of his chest wall, and lodged in the superior vena cava, causing Brown to bleed to death. At the trial, Williams contended that she shot Brown in self-defense.
 ¶ 4. On the afternoon of October 14, 2003, Williams called 911 from a store near her house and told emergency personnel to send an ambulance to her address because she had "shot somebody." The call came in at 2:44 p.m. Williams communicated her name and address and then said that she was on her way back to her house. Emergency personnel, including Paramedic Angela Dearman, were dispatched to Williams's house. The ambulance service records showed Dearman was dispatched at 2:43 p.m.[1] Dearman testified that she arrived at 2:45 p.m. and was at Brown's body a minute later. She said Brown was not breathing and had no pulse.
 ¶ 5. The first officer on the scene, Corporal Brian Payne of the Greenville Police Department, testified that when he arrived Williams was standing in her driveway near the road and seemed "rather calm." Williams told Corporal Payne that Brown was in the house and that she shot him because he was assaulting her. Williams said the gun was in her car. Officer Payne found a .25 caliber weapon in her car.
 ¶ 6. Sergeant Patsy Selders was dispatched to the scene. Sergeant Selders said she found Williams at the end of the driveway saying that all she was trying to do was to "just get him off of me" and that she was seven months pregnant. Sergeant Selders stated that Williams was not crying. Sergeant Selders observed that Williams's hair was disheveled but that Williams had no injuries to her face or bruises or cuts anywhere.
 ¶ 7. Corporal Payne testified that he went into the house and found Brown lying on the floor in the doorway between the *Page 544 
kitchen and carport. Brown was dressed only in boxer shorts and was bleeding from his left forearm and side. Sergeant Selders helped load Brown onto the stretcher and was able to observe him closely. She saw no scratches on Brown's face or injuries to his head. Corporal Payne said he found a trail of blood drops and smears in the house. The trail led from the bedroom down the hall to the locked front door, back up the hall, through the kitchen, and to the place where Brown was found. Police photographed a telephone base and receiver, pencils, and other objects lying in disarray on the bed.
 ¶ 8. Dr. Stephen Hayne performed an autopsy of Brown and offered expert testimony in the field of forensic pathology and its subfield of terminal ballistics. Dr. Hayne testified that he found no abrasions, contusions, bruises, cuts, or torn fingernails on Brown. There were no injuries to Brown's hands. Dr. Hayne testified that the photographs from the autopsy that were admitted into evidence showed the absence of these injuries. Dr. Hayne testified that the superior vena cava was a low pressure vein and it would have taken about twenty or thirty minutes for Brown to bleed to death.
 ¶ 9. Dr. Hayne further testified that the path of the bullet wound showed Brown was at a right angle from the weapon. In other words, Brown was shot by someone standing perpendicular to him on his left side. The weapon was fired from at least one and a half to two feet away from Brown. The bullet crossed the body with a ten degree upward trajectory, almost a level angle. Dr. Hayne testified that the entry wound showed Brown had his left forearm raised when Williams fired, which was consistent with defensive posturing. Dr. Hayne stated that, at the time of Brown's death, his blood alcohol level was .20. He was five feet, ten inches tall and weighed 170 pounds.
 ¶ 10. Williams was five feet, ten inches tall and weighed 227 pounds. Williams was taken into custody and gave police two statements on the day of the shooting. In her first statement at 4:05 p.m. to Investigator Veronica Velasquez, Williams related that she and Brown had been in a relationship for almost two years but that Brown was married to someone else. Williams stated that she was seven months pregnant with Brown's baby. Williams indicated that her telephone had caller identification. She said that she was taking a bath when the telephone rang. Brown answered it. Then, Brown began screaming her name.
 ¶ 11. Williams got out of the bath, dried off, dressed, and went into the bedroom. Williams told Brown that she did not know who called. Then, Brown, yelling, asked who had called and said he was not the baby's father. Brown grabbed Williams, started choking her, pushed her down on the bed, straddled her stomach, hit her repeatedly with his fist and choked her. Williams wrestled her way loose and grabbed the gun from her dresser. Williams stated that Brown kept coming toward her and the gun went off. Williams said Brown said "something like b___ take me to the hospital or something — I don't know. I just ran out of the house and I didn't go back in until after the police came." She said that Brown had never hit her before but on that day he was upset about a recent medical diagnosis. She said that as far as she knew, Brown had not had a drink that day.
 ¶ 12. Officer Velasquez testified that she looked Williams over for red marks or scratches that people usually obtain in a struggle but did not see any. After giving her first statement, Williams learned that Brown had died. Officer Velasquez testified that Williams began hyperventilating *Page 545 
and, fearing for her health, police had her taken to the hospital where she was observed and released the same day.
 ¶ 13. Williams gave her second statement at 10:30 p.m. to Detective Darrel Saxton and Lieutenant Russell Frazier. In that statement, Williams said that her friend Gregory Pennington called before she got in the bathtub. She answered, told Pennington she was about to get in the tub, and hung up. Then, Brown asked her who called. Williams walked off and got into the tub. When Williams got out of the tub, she went into the bedroom, sat down on the bed and put on lotion. Brown began hollering and cursing. Then, Brown grabbed her from behind, pulled her by the hair and neck, pulled her down on the bed, held her by the neck, straddled her stomach, and started hitting her. Brown called her names and said that the baby was not his. He hit her on the left side of the face and body with his fist and with the telephone. She tried to block him. When Williams wrestled loose, she grabbed the gun from inside a metal box on her dresser. Williams said she grabbed the gun to defend herself from Brown. Brown kept coming toward her "like he was going to take the gun or whatever." She told him to stay back and leave her alone. Then, the gun went off. Williams said that, when the gun went off, Brown was standing in front of her trying to get the gun. She heard Brown say, "b___, you shot me," and she ran out of the house. Brown walked out of the bedroom and down the hallway after her.
 ¶ 14. Williams said that she thought Brown got Pennington's number from the caller identification, that Brown called Pennington, and that Pennington was on the phone when Brown attacked her. Detective Saxton asked Williams if she had any marks on her and Williams indicated that she had an injury around her left eye area. Detective Saxton looked closely at Williams's face but saw "no marks whatsoever." Lieutenant Frazier also testified that he saw no marks whatsoever on her face.
 ¶ 15. Pennington, a school teacher and Williams's old boyfriend, testified that on October 14, 2003, he had not seen Williams for over a year. He thought Williams had called his cell phone that morning when he was in class. Pennington said he returned Williams's call after his class between 11:30 a.m. and 12:30 p.m. Williams answered and said she was about to take a bath and would call him back. Pennington said that at least one hour later he received a call from Brown. Brown identified himself and asked Pennington what the nature of his relationship was with Williams. Pennington testified that Brown sounded jealous. Pennington told Brown that he and Williams were strictly friends. Thirty to forty minutes later, Brown called back. When Pennington answered, no one was talking directly to him, but he could hear Brown tell Williams to take the phone. Williams said, "no, you called him. You talk to him." Pennington heard Brown repeatedly tell Williams to take the phone. Then, Pennington heard scuffling as if someone was gripping the receiver to cover it up or just gripping the receiver too tightly. Then, the line went dead.
 ¶ 16. The State examined Pennington with the telephone log for Williams's phone number that was earlier introduced into evidence. The log did not show a call from Williams's number to Pennington that morning. Nor did the log show a call from Pennington to Williams between 11:30 a.m. and 12:30 p.m., but it did show a call to Williams from an unknown number at 1:10 p.m. That call lasted one minute. The log also showed calls from Williams's number to Pennington at 2:33 p.m. and 2:38 p.m. Each of those calls lasted one minute.
 ¶ 17. Brown's sister, Pauline Brown, testified that in February 2004 after *Page 546 
Williams's baby was born, Williams called her and asked if Brown's family would like to see the baby. Pauline testified about the rest of the conversation: "I said, I know my brother isn't no violent person. Then she go laugh. Your brother — you brother killed himself. I said, what do you mean killed himself? She said, I had the gun in my hand and he bumped into me, and it went off."
 ¶ 18. Dr. Frank Peretti, a forensic pathologist at the Arkansas State Crime Laboratory, testified for the defense. He testified that forensic pathology does not include a subfleld of terminal ballistics. He disagreed with Dr. Hayne's conclusion that Brown's left forearm wound was consistent with defensive posturing. He testified that a forensic pathologist could not have discerned from the bullet wounds the exact position of the shooter and the victim at the time of the shooting.
 ¶ 19. Brown's widow, Hazel Brown, testified that Brown was a peaceful person who had not been abusive throughout the marriage. She said he became violent once early in their marriage when he pushed her.
 ¶ 20. Williams testified on her own behalf. Williams testified that Brown arrived that morning at about 9:30 a.m. and they lay on the bed together talking. She had called Pennington the previous day, and he called her back around noon. They spoke briefly and she went to take a bath. She bathed for about twenty minutes. Brown was in the bedroom and began yelling "who was that on the phone." During her bath, she heard Brown yelling on the phone. After her bath, she went into the bedroom to dress. Brown handed her the phone and said "tell him not to call you." She refused to speak to Pennington. Williams testified that Brown was wild with jealousy. He grabbed her by the hair and neck, straddled her, and hit her repeatedly on the left side of the face with his fist. She got up, grabbed her gun and pointed it at him, and told him to leave. He approached her "like he was reaching toward the gun," and the gun went off. She did not recall pulling the trigger. He said, "b___, you shot me." She ran out of the house and he followed her. Williams testified she grabbed the gun because she was afraid for herself and her child and did not know what Brown would do to her. She said that she had bought the gun for protection months earlier after an attempted break-in of her house.
 ¶ 21. On cross-examination, Williams stated that Brown struck her with his fist a couple of times. She said that the beating by Brown had lasted two to three minutes. She said she had smelled alcohol on Brown but had not seen him drinking that day. She again testified that Brown was coming straight at her and specifically denied that he was sideways when she shot him. When asked why she didn't flee down the hall when she stood at the door of the bedroom with the gun pointed at Brown who was in the room, she said, "it was my house, and I figured he should leave."
 ¶ 22. The jury was instructed on the theories of murder, imperfect self-defense manslaughter, heat of passion manslaughter, self-defense, and accident. The jury found Williams guilty of manslaughter and the court imposed a sentence of fifteen years.
I. WHETHER THE TRIAL COURT ERRED IN REFUSING TO GRANT APPELLANT'S MOTIONS FOR DIRECTED VERDICT AND FOR JUDGMENT NOTWITHSTANDING THE VERDICT WHEN THE WEATHERSBY RULE APPLIES TO THIS CASE.
 ¶ 23. Williams contends that, under the facts of this case, the trial court *Page 547 
should have applied the Weathersby rule and granted her motion for a directed verdict or her motion for a judgment notwithstanding the verdict. The Weathersby rule states that "where the defendant or the defendant's witnesses are the only eyewitnesses to the homicide, their version, if reasonable, must be accepted as true, unless substantially contradicted in material particulars by a credible witness or witnesses for the state, or by the physical facts or by the facts of common knowledge." Weathersby v. State, 165 Miss. 207, 147 So. 481, 482 (1933). When the evidence shows circumstances which materially contradict the defendant's version of facts, then the matter of guilt is properly an issue for the jury. Mallett v. State, 606 So.2d 1092, 1094
(Miss. 1992). Williams argues that the Weathersby rule applied to her case because she was the only eyewitness to the shooting and her version of events showed that she shot Brown in defense of herself and her unborn baby. She contends that her version of events was not materially contradicted by physical or other evidence.
 ¶ 24. A Weathersby challenge essentially tests the sufficiency of the evidence. Green v. State,614 So.2d 926, 931 (Miss. 1992). In reviewing the denial of a motion attacking the sufficiency of the evidence, this Court asks whether, considering the evidence in the light most favorable to the State, any rational jury could have found the essential elements of the crime beyond a reasonable doubt. Bush v.State, 895 So.2d 836, 843 (¶ 16) (Miss. 2005) (quotingJackson v. Virginia, 443 U.S. 307, 315, 99 S.Ct. 2781,61 L.Ed.2d 560 (1979)). A Weathersby challenge tests the sufficiency of the evidence because, if the defendant was the only eyewitness to the homicide and if her version of events is both reasonable, consistent with innocence, and uncontradicted by physical facts, facts of common knowledge or other credible evidence, then it follows that no reasonable juror could find the defendant guilty beyond a reasonable doubt. Green, 614 So.2d at 932 (citing Harvestonv. State, 493 So.2d 365, 371 (Miss. 1986)). In reviewing the trial court's Weathersby ruling, we accept all credible evidence consistent with the verdict as true and give the State the benefit of all favorable inferences that may reasonably be drawn from the evidence. Id. We will reverse only when the evidence is such that reasonable and fair-minded jurors could only have found the defendant not guilty. Id.
 ¶ 25. In support of her Weathersby argument, Williams argues that none of Dr. Hayne's opinions were a credible basis for contradicting her version of events. Williams objected to Dr. Hayne's qualification as an expert witness. After voir dire at which Dr. Hayne testified about his qualifications, the court accepted Dr. Hayne as an expert in the area of forensic pathology. On appeal, citing Dr. Hayne's testimony that he sleeps two to three hours per night and performs fifteen hundred to seventeen hundred autopsies per year, Williams argues that Dr. Hayne was unqualified to render expert testimony as a forensic pathologist. This Court reviews the lower court's rulings on the admission or exclusion of evidence for abuse of discretion. Ladnier v. State,878 So.2d 926, 933 (¶ 27) (Miss. 2004). An error in the admission or exclusion of evidence is not grounds for reversal unless the error affected a substantial right of a party.Id.; M.R.E. 103(a). Since Mississippi's adoption of the Daubert standard, Dr. Hayne has been found qualified to render expert testimony in the area of forensic pathology on numerous occasions by the courts of this State.See Powers v. State, 945 So.2d 386, 392 (¶ 10) (Miss. 2006); Wright v. State, 915 So.2d 527, 529 (¶ 3) (Miss.Ct.App. 2005); *Page 548 Cowart v. State, 910 So.2d 726, 729 (¶ 14) (Miss.Ct.App. 2005). There is nothing about Williams's argument to indicate the trial court abused its discretion in accepting Dr. Hayne as an expert in the area of forensic pathology.
 ¶ 26. It is a rare case which meets all the requirements of Weathersby. Berry v. State, 455 So.2d 774, 776
(Miss. 1984). "Usually, a factual issue is presented which requires submission of the case to the jury." Buchanan v.State, 567 So.2d 194, 196 (Miss. 1990). We find that this case was properly submitted to the jury. The facts in this case bears similarity to the facts in Buchanan, in which the court rejected the defendant's argument for the application of the Weathersby rule. Id. at 197. Buchanan shot and killed her boyfriend, Norman Boykin, when the two were alone in the house after a night out. Id. at 195. According to Buchanan, Boykin was in a violent mood and she became afraid of him. Id. She said he grabbed her and backhanded her across the face and forehead. Id. She attempted to run out the front door, but Boykin grabbed her by the hair. Id. After further tussling, Boykin said he was going to kill her. Id. Buchanan took a pistol from a dresser drawer and fired one shot wide at the door.Id. Then, Boykin came toward her and she fired the fatal shot. Id. Buchanan called the police.Id. When they arrived, the police observed that Buchanan had no marks, lacerations, or bruises on her face, though records from a hospital visit hours after the shooting indicated Buchanan had a one-centimeter laceration to the inner lip and a laceration and two bruises to the forehead.Id. at 195-96. Police stated Buchanan was not hysterical and appeared to know what she was doing and saying.Id.
 ¶ 27. The court rejected Buchanan's Weathersby
argument because her testimony supporting self-defense was substantially contradicted by the pathologist's testimony that Boykin had been shot in the back and could not have been coming toward Buchanan when she fired the fatal shot. Id.
at 197. And, the evidence showed Boykin had not been armed.Id. Further, all the blood was five or six feet away from where Buchanan claimed Boykin was standing when she fired the fatal shot. Id.
 ¶ 28. As in Buchanan, the testimony of the forensic pathologist substantially contradicted Williams's version of the events. Williams testified that Brown was coming straight at her and reaching for the gun when she shot him. Williams argues that Dr. Hayne's and Williams's description of Brown's position with respect to the weapon were both reasonable and not inconsistent with each other. Williams contends that Brown reasonably could have been described as coming straight at her though his body twisted sideways he reached for the gun. However, Williams specifically denied that Brown's side was facing her when she shot him. We find that Williams's contention that Brown was coming straight at her was materially contradicted by Dr. Hayne's finding, corroborated by the photographic evidence of the bullet wounds, that Brown's side was perpendicular to the weapon when he was shot.
 ¶ 29. Williams's version of events was also called into question by material conflicts in her statements and testimony and by material discrepancies in the timing of the events described in her statements and testimony when compared with the other evidence. In her initial statement, Williams said that the phone rang while she was taking a bath, that Brown answered, and that she did not know who called. In her second statement, Williams said it was Pennington who had called, *Page 549 
that he had called before her bath, and that she answered the phone. At trial Williams testified that she took her bath at about noon and that she bathed for about twenty minutes. The phone log revealed that the only call that could have been from Pennington was a one-minute call at 1:10 p.m. A reasonable jury could find from this evidence that Williams began bathing around 1:10 p.m., after Pennington's call, then took a twenty minute bath and was out of the bath around 1:30 p.m. Williams testified that, after her bath, Brown began screaming at her and then beat her for two to three minutes, after which she shot him. But the two calls from Williams's house to Pennington's phone number did not occur until 2:33 p.m. and 2:38 p.m. Williams's call to 911 did not occur until approximately 2:43 p.m. or 2:44 p.m. Also, Dr. Hayne testified that it would have taken Brown between twenty and thirty minutes to bleed to death from the bullet wound. When emergency personnel found Brown at about 2:46 p.m., Brown was not breathing. However, Pennington testified that he heard Brown alive during the second phone call which the phone company logged at 2:38 p.m. These time discrepancies cast material doubt upon Williams's narration of the events.
 ¶ 30. Physical evidence also substantially contradicted Williams's version of events. A lack of evidence of physical injury when the shooter claims to have been beaten can remove a case from the application of the Weathersby rule.Miller v. State, 919 So.2d 1137, 1140 (¶¶ 8-9) (Miss.Ct.App. 2005). Williams stated at various times that Brown had beaten her with his fists and the telephone. Officer Velasquez observed Williams at 4:03 p.m. and saw no marks on her face. Officers Saxton and Frazier observed Williams at 10:30 and saw no marks on her face. And, there was no injury to Brown's hands, tending to show he had not administered a beating before his death. From this evidence, the jury reasonably could have inferred that Williams lied about having been beaten by Brown. Considering the evidence as a whole, circumstances materially contradicted Williams's version of events. Viewing all of the evidence in the light most favorable to the verdict, a rational jury could find that Williams did not kill Brown in self-defense but was guilty of manslaughter, and the trial court did not err by denying Williams's motions for a directed verdict and a JNOV.
II. WHETHER APPELLANT'S CONVICTION SHOULD BE REVERSED WHEN SHE WAS UNJUSTLY PREJUDICED BY THE STATE'S MULTIPLE ACTS OF PROSECUTORIAL MISCONDUCT AND THE JURY'S DECISION WAS INFLUENCED BY THE PREJUDICE.
 ¶ 31. Williams claims that comments made by the prosecutor during the opening statement and closing argument amounted to prosecutorial misconduct which adversely affected the trial's outcome. Williams also claims that the trial court erred by denying her request for a mistrial after a tape recording of excluded evidence was mistakenly played for the jury. She contends that these errors, considered cumulatively, denied her a fundamentally fair trial.
 ¶ 32. Our standard of review for alleged attorney misconduct during opening statements or closing remarks is "whether the natural and probable effect of the improper argument is to create unjust prejudice against the accused so as to result in a decision influenced by the prejudice so created." Slaughter v. State, 815 So.2d 1122,1130 (¶ 45) (Miss. 2002). *Page 550 
A. Opening statement.
 ¶ 33. Williams filed a motion in limine to exclude the medical records from her hospital visit on the day of the shooting. The court granted the motion during the trial and excluded the medical records. The opening statements occurred when the motion in limine was pending. Williams argues that two of the prosecutor's remarks in the opening statement prejudiced her by referencing the medical records which were the subject of her pending motion in limine. In the first instance of alleged misconduct, the prosecutor stated that the officers who responded to Williams's house did not see any marks on her, "[a]nd later on, other people did not notice any injuries to her." The second instance was when the prosecutor described how Williams began hyperventilating at the police station after learning of Brown's death and was taken to the hospital. The prosecutor said, "She has to be taken to the hospital, Delta Regional, in an ambulance, and she is seen by the same doctor and the same nurse; that had just earlier been working on Mr. Brown and pronounced him dead." Again there was no objection from Williams. The failure to make a contemporaneous objection at trial constitutes a waiver of any error subsequently assigned. Cole v. State, 525 So.2d 365, 369
(Miss. 1987). Therefore any error concerning these statements is not properly before the Court. Id.
 ¶ 34. Notwithstanding Williams's waiver of these arguments, we observe that Williams was not prejudiced by the prosecutor's remarks. The evidence admitted at trial established that Detective Saxton and Lieutenant Frazier were "other people" who saw no injuries to Williams hours after she was arrested. Therefore, the prosecutor was not necessarily referencing medical personnel as the "other people" who observed no injuries to Williams "later on." And, it was established at trial that Williams was hyperventilating and was taken to the hospital. The information that Williams was seen by the same doctor and nurse that had pronounced Brown dead was extraneous to the evidence admitted at trial. However, that extraneous information was not particularly prejudicial to Williams.
 ¶ 35. Brown also argues that the prosecutor committed misconduct in opening statements by stating that he was "going to be trying to introduce some phone records of her phone number, and the purpose of the records is to show that —." At that point the judge cut the prosecutor off and reminded him that there was a pending motion in limine about the telephone records. Correctly the court noted, "The opening statement is supposed to say what you expect to prove. I think we're going way into some details that — [I] just want to be careful about that." The prosecutor agreed and did not pursue the matter further. Again, there was no contemporaneous objection from Williams. Therefore, Williams waived this issue for appeal. Cole, 525 So.2d at 369. Moreover, the remarks were not unduly prejudicial. The prosecutor never intimated to the jury what would be proven from the phone records. And, the records of Williams's phone number were admitted into evidence.
B. Closing Argument.
 ¶ 36. Williams argues that prosecutorial misconduct occurred on two instances during closing arguments when the prosecutor attempted to introduce facts that were not in evidence. In the first instance, the prosecutor stated that after calling 911 Williams decided to return home "because she knew [Brown] was lying on the floor in the house without a pulse and not breathing." Williams objected *Page 551 
to facts not in evidence. The prosecutor said he thought he could "connect this up" but that he would move on. The judge thanked him for moving on. In the second instance, the prosecutor speculated that the two calls to Pennington shown by the telephone records were made by Williams after she killed Brown in order to ask Pennington what to do. Williams objected, and the judge sustained the objection. "When a trial court sustains an objection, it cures any error." Holland v.State, 705 So.2d 307, 335 (Miss. 1997). The court sustained both of Williams's objections and, therefore, any error caused by the prosecutor's remarks was cured.
C. Request for a mistrial.
 ¶ 37. During the direct testimony of Detective Saxton, the tape and transcript of Williams's second statement to police was admitted into evidence. The prosecutor asked Saxton to play the tape and the following occurred:
 Q. Investigator Saxton, do you have a tape recorder to play this tape with?
 A. Yes, sir.
 Q. If you would, if you would put S-7 [the audiotape of the statement] into your tape recorder and bring it over here on this little ledge in front of the jury box and start the tape recording with the Court's permission.
 (WITNESS COMPLIED. TAPE PLAYED FOR THE JURY.)
 BY [the prosecutor]: That's the wrong tape.
 BY THE COURT: Please stop it.
 BY [the prosecutor]: I'll be right back, your honor.
 BY THE COURT: That's not something you're supposed to hear and [I] ask that you disregard that.
The prosecutor explained that "we've got a mix up on the tapes" and found the correct tape. The correct tape was played but Williams's attorney objected and the tape was stopped. Williams asserted that the tape was about to reveal medical information that had been excluded from evidence. The court and attorneys met in chambers and the court decided to redact two objectionable statements from the tape and transcript. The tape was replayed. However, the objectionable statements were mistakenly played for the jury as follows:
 [By Police]: Earlier you had to go out to the hospital. You got checked out by the doctors. What did they tell you when you was [sic] out there?
 [Williams]: That I was hyperventilating.
Then the following occurred:
 [Attorney for Williams]: Your honor, may we stop it and just object for the record. And, I guess at this point, ask for a mistrial. That's exactly what we asked not come in.
 [By the Court]: It's not on the transcript.
 [Attorney for Williams]: I know, but they played it on the tape. We just had it set prior. That's what we spent time back there in chambers doing setting this tape up so it wouldn't play that, and it just played it.
 [By the Court]: I'm going to instruct the jury again to go by the transcript. All right. I don't know — for the record, I don't know if they could even understand what it said. Did you all understand what was said, and I was looking for a place on the sheet, but please, in your deliberations, follow what is on this sheet. For the record, some jurors are shaking their head to say, no, we did not — that part of it was not clear. We did not understand it. All right. You may continue.
 ¶ 38. Williams argues that the trial court erroneously denied her motion *Page 552 
for a mistrial. The granting of a mistrial is within the sound discretion of the trial judge. Hoops v. State,681 So.2d 521, 528 (Miss. 1996). The court may grant a mistrial only when the harm done would render the defendant without hope of receiving a fair trial. Reed v. State, 764 So.2d 511,513 (¶ 7) (Miss.Ct.App. 2000). This Court reviews the denial of a motion for a mistrial for abuse of discretion. Spann v.State, 771 So.2d 883, 889 (¶ 9) (Miss. 2000). The trial court is in the best position to determine the prejudicial effect of an objectionable remark and the judge is given considerable discretion to determine whether the remark is so prejudicial that a mistrial should be declared. Weeks v.State, 804 So.2d 980 (¶ 37) (Miss. 2004). Where no "serious or irreparable damage" has resulted and no mistrial is declared, the trial judge should direct the jury to disregard the remark. Id.
 ¶ 39. We find that the trial court did not err in failing to grant a mistrial. The information that a doctor told Williams she was hyperventilating, though the opinion of an expert, was largely cumulative of Officer Velasquez's testimony that Williams was sent to the hospital because she was hyperventilating. Moreover, after the jury was exposed to the information, the court directed the jury to "go by the transcript." This issue is without merit.
D. Cumulative error.
 ¶ 40. Williams's final argument is that the errors in this case, while perhaps not reversible alone, combine to create cumulative error. The supreme court has held that errors, though not reversible in themselves, will require reversal if the errors in combination denied the defendant the right to a fundamentally fair and impartial trial. Byrom v.State, 863 So.2d 836, 847 (¶ 12) (Miss. 2003). The only error we have identified is the error in playing the wrong portion of Williams's taped statement. We have affirmed the trial court's decision not to grant a mistrial regarding that error. There are no other errors to view in combination with the tape error. Since we have found that multiple errors did not occur, there can be no cumulative error or cumulative prejudicial effect. Sullinger v. State,935 So.2d 1067, 1074 (¶ 29) (Miss.Ct.App. 2006).
 ¶ 41. THE JUDGMENT OF THE CIRCUIT COURT OF WASHINGTONCOUNTY OF CONVICTION OF MANSLAUGHTER AND SENTENCE OF FIFTEENYEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OFCORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSEDTO WASHINGTON COUNTY.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, GRIFFIS, BARNES, ISHEE, ROBERTS AND CARLTON, JJ., CONCUR.
[1] The trial testimony acknowledged a slight discrepancy between the Emergency 911 time records and the time records of the ambulance service.