# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-KA-00183-COA

**DEUNTA D. GARDNER A/K/A DEUNTA DWARD GARDNER A/K/A DEUNTA GARDNER**                    **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                    **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 01/11/2018 |
| TRIAL JUDGE: | HON. SMITH MURPHEY |
| COURT FROM WHICH APPEALED: | TALLAHATCHIE COUNTY CIRCUIT COURT, SECOND JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: MATTHEW WYATT WALTON |
| DISTRICT ATTORNEY: | JOHN W. CHAMPION |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 12/10/2019 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### BEFORE BARNES, C.J., McCARTY AND C. WILSON, JJ.

### C. WILSON, J., FOR THE COURT:

¶1. A jury convicted Deunta Gardner of conspiracy to commit aggravated assault, aggravated assault, kidnapping, and possession of a firearm by a felon. The circuit court sentenced Gardner to serve five years for conspiracy, twenty years for aggravated assault, thirty years for kidnapping, and ten years for possession of a firearm by a felon, in the custody of the Mississippi Department of Corrections (MDOC). The sentences were set to run consecutively. Aggrieved, Gardner appeals his convictions. Gardner contends that he is warranted a new trial because the victims' in-court and out-of-court identifications of him

should have been suppressed; that prejudicial testimony about prior criminal activity rendered his trial unfair; and, as raised in a separate pro se brief, that he was deprived of a fair trial and due process because his out-of-state witnesses did not receive adequate travel funds. Finding no reversible error, we affirm Gardner's convictions and sentences.

## FACTS AND PROCEDURAL HISTORY

¶2. Deon Grayer lived in a house in Tutwiler, Mississippi, with his aunt, Shirley Pugh, and Gardner's brother, Dewayne Gardner. On July 28, 2015, Dameon Hale came over to the residence. While at Grayer's residence, Hale, Pugh, and Dewayne had a conversation regarding a firearm Pugh owned. A physical altercation broke out between Hale and Dewayne as a result of this conversation. When the fight ended, with Hale the apparent victor, Pugh made everyone leave the house. Before departing, Dewayne allegedly told Hale, "Don't worry about it, I'll be back. I'm going to get my brother and he [is] going to kill you; he already done killed somebody before."

¶3. Later that evening, Grayer returned to the residence and was the only one in the home when Dewayne also returned that night with Gardner. Dewayne and Gardner entered the house, with Gardner carrying a firearm. The home was dimly lit with the only light coming from the kitchen and a lighted aquarium. Gardner and Dewayne found Grayer in the living room. Gardner pointed his pistol at Grayer's head and began asking Grayer questions. Regardless of whether Grayer answered, Gardner repeatedly struck Grayer on the side of his face with the pistol. Grayer tried to get the gun out of Gardner's hands, resulting in a tussle, but Grayer was eventually subdued. Dewayne and Gardner forced Grayer onto the ground,

2

where Gardner proceeded to bind Grayer's hands and feet with duct tape. The brothers placed duct tape over Grayer's mouth.

¶4. The record reflects that during this time, Hale received a call from Grayer's phone, but Grayer did not say anything when Hale answered. Hale then called back, and Grayer answered but again did not say anything. Hale decided to check on Grayer and drove to Grayer's residence. When Hale arrived, he saw Dewayne's vehicle parked outside. After honking the horn, Hale went to the front door and knocked. When his knocks went unanswered, he entered the house. As Hale entered, Gardner shot at Hale several times. Hale shot back, hitting Dewayne. Hale was shot several times, eventually dropping to the floor and, in his words, "playing dead." While Hale was lying on the ground wounded, Gardner came up and kicked him in the head. When kicked, Hale looked straight up and "looked at [Gardner] eye to eye." Hale then watched as Gardner stuck a pistol into Hale's mouth and pulled the trigger, shooting Hale two more times. In all, Hale was shot seven times. Still conscious, Hale observed Gardner and Dewayne retreat farther into the house.

¶5. Gardner and Dewayne eventually left through the back door and fled in their vehicle. Grayer's neighbor, Angela Stovall, heard the gun shots and observed Gardner and Dewayne leaving Grayer's house as she was returning home from work. As Stovall hurriedly tried to unlock her door, she saw Gardner point his gun at her. She was able to enter her home, where she remained until she heard Dewayne and Gardner drive off. Stovall then saw Grayer hopping across the street, still bound by duct tape. Stovall cut Grayer loose from his duct-tape bindings and then found a bloodied Hale sitting in his vehicle. After helping Hale out

3

of his vehicle, Stovall went for the police, and officers arrived on the scene shortly thereafter.

¶6.     Dewayne and Gardner were quickly identified as suspects.  Bryan Sullivant, an investigator with the Mississippi Bureau of Investigation, assisted with the investigation. Agent Sullivant presented Grayer with a photo lineup containing Gardner's picture.  Agent Sullivant told Grayer, "[I]f you see the guy, circle him, circle the picture; and if you don't know or if you're unsure, just don't guess, only [circle] if you know."  Grayer immediately identified Gardner as being involved in the incident.  Gardner's fingerprints were also found on the duct tape used to bind Grayer.

¶7.     On February 7, 2017, a Tallahatchie County grand jury indicted Gardner for conspiracy to commit aggravated assault, aggravated assault, kidnapping, and possession of a firearm by a convicted felon.  On April 7, 2017, Gardner filed a pretrial motion to suppress Grayer's photo identification, arguing that the lineup was highly suggestive and prejudicial.

¶8.     After hearing argument on Gardner's motion on April 17, 2017, the circuit court denied the motion to suppress, finding that the "series of photographs [were] not impermissibly suggestive."  The circuit court stated that "when looking at the individuals that are in these six photographs, they are all extremely similar and . . . there's nothing that conspicuously singles out any of them."  The circuit court noted that "it would take a person having very good knowledge of the person being selected to pick out a certain individual." The circuit court also found that the lineup procedure employed by Agent Sullivant was not impermissibly suggestive.    The court then determined that Grayer's out-of-court

4

identification was reliable under *Biggers*,[1] stating:

> [Grayer] knew [Gardner;] just didn't know [Gardner's] name . . . when [Grayer was] being assailed [he had an] easy opportunity to direct his attention at his assailants . . . . There was no hesitation on the part of the witness at the time that the identification was made from the photo array; that he was attentive when he, of course, was getting duct taped and pistol-whipped at the hands of the defendant and his brother; that the level of certainty that was demonstrated by [Grayer] was not shaken, that he was, in fact, certain of his identification from the photographic lineup using the memory and the information that he had obtained at the time he was assailed; and this happened very shortly . . . within approximately 24 hours of what was taking place between the event and the photographic array.

The circuit court concluded that, "viewing [the *Biggers* factors] based upon the totality of the circumstances . . . [it did] not see . . . a legal valid basis upon which to suppress [Grayer's] identification of [Gardner]."

¶9. Gardner's three-day jury trial began on November 27, 2017. At trial, Grayer authenticated the photo lineup that Agent Sullivant presented to him and confirmed Gardner as the individual that he had identified in the photo lineup. Grayer also identified Gardner in the courtroom as the person who entered his home with Dewayne and struck him in the face with a pistol.

¶10. Hale also identified Gardner in the courtroom. Hale testified that he was "positive" that Gardner was the person who shot him. Hale also testified that the chain of events at issue began when he had a fistfight with Dewayne over a gun. Hale testified that, after the fight, Dewayne told Hale, "Don't worry about it, I'll be back. I'm going to get my brother and he [is] going to kill you; he already done killed somebody before." Gardner's trial

---

[1] *Neil v. Biggers*, 409 U.S. 188, 93 S. Ct. 375 (1972).

5

counsel objected to Hale's testimony as hearsay. The circuit court overruled the objection, finding that the testimony was admissible under the exceptions to the rule against hearsay provided by Rule 803 of the Mississippi Rules of Evidence. The court specifically found that Hale's testimony constituted an "excited utterance" by Dewayne under Rule 803(2) and a statement of Dewayne's "then-existing state of mind" under Rule 803(3). The circuit court also determined that the testimony passed "through the [Rule] 403 filter," finding that the statement was more probative than prejudicial. M.R.E. 403. The circuit judge then sua sponte instructed the jury to disregard the last part of Hale's testimony that "he already done killed somebody before," and polled the jury to confirm that each juror would follow the court's limiting instruction. At the close of the evidence, the court gave a written jury instruction reiterating the limitation.

¶11. Gardner also testified at trial. He offered an alibi defense, stating that he was in Virginia Beach, Virginia, on July 28, 2015, not in Tutwiler, Mississippi. Gardner testified that he was unaware of how his fingerprints ended up on the duct tape used to bind Grayer.

¶12. On November 29, 2017, the jury convicted Gardner on all counts. The circuit court sentenced Gardner to five years for conspiracy to commit aggravated assault, twenty years for aggravated assault, thirty years for kidnapping, and ten years for possession of a firearm by a felon, with the sentences to be served consecutively in MDOC's custody. The circuit court denied Gardner's post-trial motions for a judgment notwithstanding the verdict and for a new trial.

¶13. Gardner now appeals to this Court. Gardner contends that the circuit court erred by

denying his motion for a new trial. Specifically, he asserts that Grayer's in-court and out-of-court identifications of Gardner were tainted by an overly-suggestive photo lineup, and as such the photo lineup and identifications should have been suppressed. Gardner also asserts that Hale's testimony regarding Gardner's past criminal activity rendered his trial unfair. Lastly, in his pro se supplemental brief, Gardner contends that because he was denied reasonable funds to secure out-of-state witnesses to substantiate his alibi defense, he was denied a fair trial and due process. Considering these issues, we find no error and affirm.

## DISCUSSION

¶14. "A motion for a new trial simply challenges the weight of the evidence." *Daniels v. State*, 107 So. 3d 961, 963 (¶12) (Miss. 2013). We will reverse the trial court's denial of a motion for a new trial only if the trial court abused its discretion by doing so. *Id.* "Our role as appellate court is to view the evidence in the light most favorable to the verdict and disturb the verdict only when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Little v. State*, 233 So. 3d 288, 289 (¶1) (Miss. 2017). Gardner's post-trial motion for a new trial included, inter alia, a number of challenges to the verdict based on the weight of the evidence. To the extent Gardner reasserts those grounds here, our review of the record demonstrates that the verdict is not "contrary to the overwhelming weight of the evidence," such that any challenge to the weight of the evidence is without merit. We address the specific evidentiary issues that Gardner contends mandate a new trial as follows.

    I.      Denial of Motion To Suppress

7

¶15. Gardner asserts that the photo lineup presented to Grayer by law enforcement was overly suggestive, such that Grayer's identification of Gardner should have been suppressed. "The standard of review for suppression hearing findings in pretrial identification cases is whether or not substantial credible evidence supports the trial court findings that, considering the totality of the circumstances, [the] in-court identification testimony was not impermissibly tainted." *Butler v. State*, 102 So. 3d 260, 264 (¶8) (Miss. 2012). This Court will not disturb a trial court's ruling on a motion to suppress evidence unless "there is an absence of substantial credible evidence supporting it." *Id*.

¶16. For an out-of-court or in-court identification to be excluded, "it must be the result of an impermissibly suggestive lineup and the identification must be unreliable." *Id*. (emphasis omitted) (citing *York v. State*, 413 So. 2d 1372, 1383 (Miss. 1982)). "A lineup or series of photographs is impermissibly suggestive if the accused, when compared with the others, is conspicuously singled out in some manner from the others, either from appearance or statements by an officer." *Id*. at (¶9) (internal quotation mark omitted). Where the defendant is "the only one depicted with a distinctive feature," courts have found the lineup to be impermissibly suggestive. *Bankston v. State*, 391 So. 2d 1005, 1008 (Miss. 1980) (determining that when a defendant was the only one with a mustache, and the victim specifically remembered the robber had a mustache, the photo lineup was impermissibly suggestive). But "minor differences" between the suspects or differences in photograph backgrounds will not render a lineup impermissibly suggestive. *Butler*, 102 So. 3d at 265 (¶11); *see also Jones v. State*, 993 So. 2d 386, 393 (¶15) (Miss. Ct. App. 2008) (determining

8

that when a defendant was the only one wearing a coat, the minor difference was not impermissibly suggestive).

¶17. Gardner asserts that the lineup shown to Grayer was suggestive because (1) three out of the six individuals wore earrings, and there was nothing in the police statements suggesting that Gardner wore earrings at the time of the offenses; (2) one individual was smiling or grinning; and (3) Gardner's head posture was cocked back while the others were "cocked forward," singling him out from the other five individuals.[2] However, these are distinctions without a consequential difference, and Gardner's challenge to the photo lineup is without merit.

¶18. Much like *Jones*, the minor differences between the suspects in Gardner's photo lineup are not impermissibly suggestive. In fact, during Gardner's suppression hearing, the circuit court considered these characteristics, finding that "the photographs were strikingly similar in appearance, and would take a person having very good knowledge of the person being selected to pick out a certain individual." We agree. The record does not reflect that Gardner was conspicuously singled out by appearance or otherwise, and there is no evidence that Agent Sullivant made any suggestive statements to Grayer. The differences between the six depicted individuals are minor, and the circuit court acted well within its discretion to find that the photo lineup was not impermissibly suggestive.

¶19. Even if the distinctions posited by Gardner rendered the photo lineup impermissibly

---

[2] In Gardner's pretrial motion to suppress, he also contended the lineup was flawed because the photo of Gardner was from when he was seventeen years old. Gardner does not renew this argument on appeal.

9

suggestive, Grayer's out-of-court identification was nonetheless reliable. The United States

Supreme Court articulated five factors to consider when evaluating reliability of a witness

identification, based on the totality of the circumstances:

> [T]he factors to be considered in evaluating the likelihood of misidentification include [(1)] the opportunity of the witness to view the criminal at the time of the crime, [(2)] the witness' degree of attention, [(3)] the accuracy of the witness' prior description of the criminal, [(4)] the level of certainty demonstrated by the witness at the confrontation, and [(5)] the length of time between the crime and the confrontation.

*Neil v. Biggers*, 409 U.S. 188, 199-200 (1972). The Mississippi Supreme Court adopted the

*Biggers* test in *York v. State*, 413 So. 2d 1372, 1382 (Miss 1982).

¶20. Here, substantial credible evidence supported the circuit court's conclusion that

Grayer's out-of-court identification of Gardner was reliable. As weighed by the circuit court,

Grayer had ample opportunity to view Gardner and, indeed, acutely focus his attention on

Gardner during the crime—Gardner repeatedly struck Grayer in the face with a pistol while

asking Grayer questions, and afterward, Gardner bound Grayer's hands and feet with duct

tape. While Grayer did not identify Gardner by name before the photo lineup, he told police

that "[Dewayne's] brother" was with Dewayne during the incident. Agent Sullivant testified

that Grayer identified Gardner "right away" when he was presented with the photo lineup.

Lastly, the out-of-court identification was done within twenty-four hours of the crime. Under

the totality of the circumstances, Grayer's out-of-court identification was reliable.

¶21. Given that the photo lineup presented to Grayer was not impermissibly suggestive and

given that Grayer's out-of-court identification of Gardner was otherwise reliable, we find no

error in the circuit court's denial of Gardner's motion to suppress Grayer's out-of-court

10

identification, and Grayer's in-court identification of Gardner was not impermissibly tainted. This assignment of error lacks merit.

II.     "Manifest Necessity" for a Mistrial

¶22.    Gardner next argues that the admission of Hale's "incendiary" testimony regarding Dewayne's threat to Hale after their initial fistfight rendered the trial unfair, such that the circuit court should have granted a mistrial sua sponte. Gardner also cited the circuit court's allowance of Hale's testimony as a ground in support of his post-trial motion for a new trial. The decision to grant or not grant a mistrial lies within the sound discretion of the trial court and is reviewed for abuse of discretion. *Clark v. State*, 40 So. 3d 531, 538 (¶14) (Miss. 2010), disagreed with on other grounds by *Portis v. State*, 245 So. 3d 457, 470 (¶30) & n.10, 471 (¶32) (Miss. 2018). If error "substantially and irreparably" prejudices the defendant's case, then the trial court must grant a mistrial. *Id*. However, the trial court has "considerable discretion in determining if a mistrial is warranted . . . ." *Harrell v. State*, 947 So. 2d 309, 316 (¶23) (Miss. 2007). "The standard of review regarding admission or exclusion of evidence is abuse of discretion." *Tillis v. State*, 176 So. 3d 37, 45 (¶15) (Miss. Ct. App. 2014).

¶23.    At trial, Hale testified that after their initial fistfight, Dewayne made the following statement to Hale: "Don't worry about it, I'll be back. I'm going to get my brother and he [is] going to kill you; he already done killed somebody before." Gardner's counsel did not contemporaneously request a mistrial. Instead, counsel lodged a continuing hearsay objection to Hale's testimony and further argued that the testimony was highly prejudicial

11

even if admissible. The circuit court agreed that Hale's statement was hearsay but found that it was "a non-testimonial hearsay statement that fell within the [Mississippi Rule of Evidence] 803 exceptions" of "excited utterance and . . . existing state of mind" and was therefore "properly admissible." M.R.E. 803(2)-(3). The circuit court then weighed "that ruling through the [Mississippi Rule of Evidence] 403 filter, [and found] that it [was] a statement that [was] more probative than prejudicial, and that the prejudicial effect [did] not outweigh its probative value."

¶24. After its evidentiary ruling, the circuit court instructed the jury to disregard the end of Hale's statement that Gardner "already done killed somebody before." The circuit court then polled each juror to confirm that they could follow the court's instruction. The jurors affirmed that they would do so. At the end of the trial, the circuit court also gave the following written jury instruction: "The Court instructs you, the Jury, that you shall disregard the portion of [Hale's] testimony which the court admonished you about during the trial and continue to comply during your deliberations with the Court Order from the bench." Again, on a careful review of the record, we find no error in the circuit court's limiting instructions regarding the challenged testimony.

¶25. Gardner asserts that instead of giving a limiting instruction, the circuit court should have declared a mistrial sua sponte pursuant to the "manifest necessity" rule found in *Spann v. State*, 557 So. 2d 530, 532 (Miss. 1990) (granting mistrial during defendant's testimony because his wife shouted derogatory comments from the gallery regarding defendant's truthfulness and trial court concluded that there was no way to avoid jury prejudice).

12

Whether the manifest necessity standard has been met turns on the facts and circumstances of each case. *Id.* (citing *Watts v. State*, 492 So. 2d 1281, 1284 (Miss. 1986)).[3] But "a mistrial is not the inevitable result every time the jury is permitted to hear inadmissible evidence." *Reed v. State*, 764 So. 2d 511, 514 (¶12) (Miss. Ct. App. 2000). This is because "the trial court is in the best position to assess the prejudicial impact of the improper evidence and decide whether a mistrial is necessary or whether the prejudice can be cured by admonishing the jury to disregard it." *Id.* The question is whether the jury was biased or tainted beyond cure as a result of Hale's statement. *See Hoops v. State*, 681 So. 2d 521, 528-29 (Miss. 1996). We find that it was not.

¶26.   In *Reed*, this Court dealt with a factual scenario similar to the one here. There, the defendant was on trial for rape. *Reed*, 764 So. 2d at 512 (¶1). The prosecution's witness stated that he believed that the defendant had been previously convicted "for a sexual offense." *Id.* at 513 (¶8). The trial court then gave a limiting instruction for the jury to disregard the statement. *Id.* The trial court also noted on the record that the jurors indicated that they would comply with the limiting instruction. *Id.* This Court affirmed, noting that the trial court, addressing the matter first-hand, was apparently satisfied that the limiting instruction and the jury's stated compliance were sufficient to minimize any prejudice to the defendant. *Id.* at 514-15 (¶¶13-15) (finding no manifest error in the record).

¶27.   Here, the circuit court likewise did not err in its approach in dealing with the

---

[3] In *Watts*, our supreme court provided several examples of when a mistrial would likely be a manifest necessity: "failure of a jury to agree on a verdict"; a biased or otherwise tainted jury; improper separation of the jury; and where jurors showed an unwillingness to follow the court's instructions. *Watts*, 492 So. 2d at 1284 (citations omitted).

testimony in question. The circuit court weighed Hale's testimony under the rules of evidence and determined that even though his repetition of Dewayne's threat was hearsay, Dewayne's statement to Hale was admissible under Rule 803(2) and (3). The circuit court also weighed the statement against Rule 403's balancing test and determined that Hale's statement was more probative than prejudicial. But the circuit court then instructed the jury to disregard the evidence of Gardner's prior bad act and confirmed with each juror that the jury would follow the court's limiting instructions. At the end of trial, the circuit court gave a written jury instruction—without repeating the offending statement—to remind the jury to "disregard the portion of [Hale's] testimony which the court admonished you about during the trial and continue to comply during your deliberations with the Court Order from the bench." In each of these decisions, during and after the trial, the circuit court acted within its discretion. Gardner's contention that the circuit court should have declared a mistrial sua sponte after Hale's testimony is thus without merit, and the circuit court likewise did not err in denying Gardner's post-trial motion for a new trial on this ground.

III.    Out-of-State Witnesses

¶28.    In his pro se supplemental brief, Gardner asserts that his due process rights were violated because he was not afforded "a reasonable amount of funds to secure the presence of several alleged witnesses . . . to verify [Gardner's alibi that he was in Virginia at the time the crimes were committed]." But the record belies Gardner's contention.

¶29.    Mississippi Code Annotated section 99-9-33 (Rev. 2015) sets forth the procedure for summoning out-of-state witnesses to testify in a criminal prosecution in this state. Section

14

99-9-33 provides in relevant part: "If the witness is summoned to attend and testify in [Mississippi], he shall be tendered the sum of ten ($.10) cents a mile for each mile and five ($5.00) dollars for each day that he is required to travel and attend as a witness."

¶30. On August 18, 2017, the circuit court entered an order granting Gardner's Petition to Secure the Attendance of Out-of-State Witnesses. This order granted advance "travel and per diem fees" according to section 99-9-33 to Antonio Robinson, Shawntae Lassiter, and Brandy Ross, purportedly all alibi witnesses for Gardner. On November 17, 2017, Gardner filed a motion requesting extra funds to cover $157.80 in additional travel expenses for Lassiter (for bus fare). The circuit court granted Gardner's motion the same day. The circuit court noted that "it [was] the court's opinion that the request for this additional money [was] in fact warranted as necessary court expenses to insure a fair trial." Subpoenas were issued for the three witnesses. Robinson and Lassiter were both served, but Ross could not be located. None of the witnesses appeared at trial.

¶31. Gardner alleges that had "his witness[es] been provided a fair amount of funds to secure their livel[i]hood during the trial[,] they would have been present and the jury would not have convicted [him]." Gardner does not detail what "fair amount of funds" would have induced the witnesses to appear at trial, but the record reflects that the circuit court followed the statute in providing each of Gardner's purported alibi witnesses the allowance set forth in section 99-9-3. And the court went further to grant additional funds requested by Gardner to enable Lassiter to appear. Gardner's trial counsel informed the circuit court that Lassiter was subpoenaed and given her check. But she did not appear, and Gardner never requested

15

any additional funds or other relief from the circuit court. To the extent Gardner's witnesses failed to appear in his defense, their non-appearance was not the result of any error by the circuit court. This issue is without merit.

¶32.   **AFFIRMED.**

**BARNES, C.J., CARLTON AND J. WILSON, P.JJ., GREENLEE, WESTBROOKS, TINDELL, McDONALD, LAWRENCE AND McCARTY, JJ., CONCUR.**