GRIFFIS, J.,
 

 for the Court.
 

 ¶ 1. At a prior trial Charles Wayne Ross was convicted of capital murder and sentenced to death in the Circuit Court of Tippah County. On direct appeal, the supreme court reversed the conviction finding reversible error in both the guilt and sentencing phases of the trial.
 
 Ross v. State,
 
 954 So.2d 968 (Miss.2007)
 
 (“Ross I”).
 

 ¶2. Ross was re-tried and found guilty of murder. He was sentenced, as a habitual offender, to life in the custody of the Mississippi Department of Corrections (“MDOC”) without eligibility for parole or early release. Ross appeals and claims that: (1) the trial court denied him the right to confront the witnesses against him when it limited cross-examination of these witnesses; (2) he was prejudiced by testimony regarding his bad character and a prior conviction; (3) the verdict is not supported by the weight of the evidence; (4) the cumulative effect of the trial court’s errors on the admissibility of evidence rendered his trial unfair; (5) his expert witness was erroneously excluded; (6) the trial court erred when it refused to suppress evidence gathered from his car in a warrantless automobile search; and (7) the trial court erred when it refused jury instruction D-6. We find no error and affirm.
 

 FACTS
 

 ¶ 3. On Friday June 28, 1996, Hershall Ray Yancey was shot four times at his home in rural Tippah County. His mother, Marie Yancey (“Marie”), discovered his body the following morning after he failed to show up for breakfast with her at her home across the street. His television, VCR, and wallet were missing.
 

 1. Dennis McCollum’s Testimony
 

 ¶ 4. Yancey’s truck was not running, so co-worker Dennis McCollum gave him a ride to work at WACO Construction (“WACO”) and home again. On the way home from work, Yancey had attempted to cash his check at local store, but the store did not have enough money to cash the check. The co-worker testified that he dropped Yancey off at home between 7:05 p.m. and 7:10 p.m. The co-worker had loaned Yancey $9 on Thursday, and they stopped to get something to eat on Thursday, the day before the shooting.
 

 
 *406
 
 ¶ 5. McCollum testified that Ross had also worked for WACO and that WACO always paid on Fridays. McCollum, Ross, and Yancey had all met before at a WACO job site.
 

 2. Marie Yancey’s Testimony
 

 ¶ 6. Marie, the deceased’s mother, was ninety-three years old at the time of the second trial and was unable to testify, but her testimony from the first trial was read to the jury. A transcript of her testimony was not included in the record before this Court. However, the supreme court’s opinion was included in the record, and Marie’s testimony was quoted therein.
 

 ¶ 7. Marie testified that she returned home Friday night at approximately 9:10 p.m., and shortly thereafter, she heard a loud vehicle passing her home. At 9:28 p.m., she heard what she believed to be the same vehicle start up at Yancey’s home, and she saw the vehicle drive away toward Dumas, Mississippi.
 

 3. Linda Grey’s Testimony
 

 ¶ 8. Yancey’s neighbor, Linda Grey, testified that at approximately 9:45 p.m. on the night Yancey was killed, she heard a “loud car [go] up and down the road,” and it turned around in front of her house two or three times. Grey was scared and made her children hide in the bathroom. She went outside to investigate and hid behind a column on her home. She testified that the car’s passenger-side taillight was broken, and the car was a dark color. While in front of Grey’s home, the driver exited the car and looked under the hood. She testified that the driver appeared to be a very small man. The car traveled toward Yancey’s home when it left her home. Grey could hear the car idling down the road, but it did not sound like it was moving.
 

 L Carrie Beatty’s Testimony
 

 ¶ 9. Grey’s daughter, Carrie Beatty, testified that she arrived at her mother’s home at approximately 10:00 p.m., and she saw an early 1970s model, mint-green Chevrolet truck at the end of Yancey’s driveway. Although she traveled by Yan-cey’s house two or three times a week, she had never seen this truck there before. She testified that when she arrived at Grey’s home, Grey was hiding behind a column and was nervous and upset. Grey told her daughter about the car that had been turning around in front of her home.
 

 5. Sheriff Gary Mamey’s Testimony
 

 ¶ 10. Gary Mauney, the Sheriff of Tip-pah County at the time of the murder, testified that he heard Ross’s name mentioned by people outside Yancey’s home when he was working the scene on the morning that Yancey’s body was discovered. Following up on this information, investigators questioned Margaret Payne (“Payne”), Ross’s half-sister, and her boyfriend, Tommy Hale (“Hale”). At that time, Payne and Hale were not forthcoming with information about Yancey’s murder.
 

 6. Margaret Payne’s testimony
 

 ¶ 11. Ross had spent the night at Hale’s house that Hale shared with his son, Margaret Payne, and Payne’s fifteen-year-old son — Jerry Sanders (“Sanders”). Payne testified that Ross was at Hale’s house the day Yancey was murdered. Ross arrived at approximately 4:30 p.m., left between 8:00 p.m. and 8:30 p.m., and returned between 11:00 p.m. and 11:30 p.m. He was driving his loud, black Mercury Cougar.
 

 ¶ 12. Payne testified that when Ross returned for the night, he was drunk and had a wallet, television, and VCR with him. The power cord was severed on the television. He told Payne that he wanted to
 
 *407
 
 talk to her. On direct-examination, the State asked Payne the following:
 

 Q: Okay. He wanted to talk to you. What did y’all talk about?
 

 A: Well, he showed me a wallet.
 

 Q: Okay.
 

 A: And he started telling that he killed a man.
 

 Q: What specifically did he tell you?
 

 A: He told me he killed the son of a bitch.
 

 Q: Anything else?
 

 A: That, you know, he robbed him.
 

 Q: Did he indicate anything about what he had stolen or anything?
 

 A: He had his wallet, and he said that he shot the son of a bitch, and all he had was $5 in his wallet.
 

 Payne testified that she saw an identification card and $5 in the wallet, and that Ross burned the wallet on a grill later that night. She said she was sure the name on the identification card was Ray Yancey. Payne and Ross went outside, and Ross got a gun out from under a seat in his car and threw it down a hill behind the house.
 

 ¶ 13. After all of this, Payne went inside the home and told her nephew, Donald Ross, Jr. (“Donald”), who was spending the night with Payne’s son, Sanders, what Ross had told her. She also told Hale. The information prompted Hale to look for his .22-caliber pistol in his sock drawer, but the gun was missing. Hale and Payne talked for a while about what Ross had told her. Hale eventually went to sleep, but Payne stayed up all night because she was scared. Ross slept on the couch at Hale’s house. The next morning, Payne, Hale, and Sanders went to visit Ross’s and Payne’s mother, Nellie Bracken (“Bracken”). Payne testified that she told Bracken everything that Ross had told her, and Bracken believed her and cried.
 

 7. Tommy Hale’s Testimony
 

 ¶ 14. Hale’s testimony was consistent with Payne’s testimony. Hale testified that Ross was at Hale’s home when he returned from work Friday afternoon, Ross left at approximately 8:00 p.m. in his Mercury Cougar, and he returned to Hale’s home at approximately 10:00 p.m. with a television and VCR. Ross told Hale that he did not need to know where the television and VCR came from. Hale also said that Ross looked like he had been drinking. Hale testified that Sanders and Donald Ross, Jr., returned home for the evening about the same time that Ross did.
 

 8. Jerry Sanders’s Testimony
 

 ¶ 15. Donald and Sanders had been riding around that night with their girlfriends in Donald’s Bronco II. Sanders testified that he and Donald returned home around midnight and there was a television' — with a broken cord' — and a VCR sitting in the middle of the living room. Ross was already at the home and seemed like he had been drinking.
 

 9. Evidence and the Investigation
 

 ¶ 16. There were no signs of forced entry or a struggle. Investigators recovered a 1996 Olympics Budweiser beer can from Yancey’s coffee table and a severed electrical cord and pieces of a taillight from his driveway.
 

 ¶ 17. Donald told his mother what he knew about Yancey’s murder when he returned to his home after spending the night with Sanders. His mother took him to the police station so he could tell them what he knew.
 

 ¶ 18. Payne and Hale were not forthcoming the first time they were interviewed by investigators. However, the investigators returned to the Hale’s home
 
 *408
 
 after speaking with Donald and Payne. Hale told the investigators what Ross had told them, pointed out where Ross threw the gun down the hill, and showed them the television and VCR.
 

 ¶ 19. Investigators found a .22-caliber pistol in a ditch behind Hale’s home. There were five empty shell casings in the gun and one live round. Investigators also recovered the television and VCR from Hale’s home. The State’s ballistic expert said this gun had characteristics that were consistent with the bullets recovered from Yancey’s body.
 

 ¶ 20. Ross’s Mercury Cougar was found at Donald Ross, Sr.’s (“Donald, Sr.”) home. The car was impounded and an inventory search was conducted without a warrant. Investigators found seven empty Budweiser beer cans and one unopened Budweiser Olympic beer can.
 

 ANALYSIS
 

 1. Did the trial court deny Ross the right to confront the witnesses against him when it liviited cross-examination of the State’s witnesses?
 

 ¶ 21. Ross argues that the trial court committed reversible error when it denied him the opportunity to broadly confront the State’s witnesses during cross-examination.
 

 ¶ 22. “The scope of cross-examination, although ordinarily broad, is within the sound judicial discretion of the trial court and such court possesses an inherent power to limit such examination to relevant factual issues.”
 
 Dozier v. State,
 
 257 So.2d 857, 859 (Miss.1972).
 

 A. Jerry Sanders
 

 ¶ 23. Ross argues that under Mississippi Rule of Evidence 609, the trial court should have allowed him to cross-examine Sanders with Sanders’s prior conviction for attempted burglary. The State argues that any error was harmless.
 

 ¶ 24. Sanders pleaded guilty to attempted burglary of a pharmacy in 2006. He had developed an addiction to prescription drugs after oral surgery and attempted to burglarize a pharmacy in order to satisfy his addiction. Ross asked to cross-examine Sanders about this conviction. The trial court ruled that the remoteness of the conviction to the murder made the conviction inflammatory, prejudicial, and not probative of Sanders’s honesty. The trial court denied Ross the opportunity to cross-examine Sanders on the conviction, but it allowed him to question Sanders about his drug addiction and use.
 

 ¶ 25. Rule 609 states, in part, that:
 

 (a) General Rule. For the purpose of attacking the character for truthfulness of a witness,
 

 (1) evidence that (A) a nonparty witness has been convicted of a crime shall be admitted subject to Rule 403, if the crime was punishable by death or imprisonment in excess of one year under the law under which the witness was convicted, and (B) a party has been convicted of such a crime shall be admitted if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the party; and
 

 (2) evidence that any witness has been convicted of a crime shall be admitted if it involved dishonesty or false statement, regardless of punishment.
 

 M.R.E. 609. The comment to Rule 609 explains:
 

 Rule 609(a)(1) was amended in 2002 to incorporate the rationale of decisions by the Mississippi Supreme Court which recognized the difference in the highly
 
 *409
 
 prejudicial effect of showing the convictions when the witness is the accused and the little prejudicial effect from such impeachment of other witnesses. It was reasoned that when the impeachment by-convictions is of a witness other than the accused in a criminal case there is little or no unfair prejudice which can be caused to a party. Thus, the probative value on the credibility of the witness will almost always outweigh any prejudice.
 

 M.R.E. 609 cmt.
 

 ¶ 26. The State admits in its brief that under the plain language of Rule 609, Sanders’s conviction was admissible for impeachment purposes. However, the State argues that the error was harmless.
 

 ¶ 27. We agree. The trial court did not hinder Ross’s ability to question Sanders about his drug use or the effect that the use might have on his testimony. In
 
 Rogers v. State,
 
 796 So.2d 1022, 1026(¶ 10) (Miss.2001), the supreme court held that “[ajlthough there may have been error in not allowing [the defendant] to introduce evidence of Johnson’s prior convictions for impeachment, any such error is harmless since [the defendant] was able to use the testimony of Johnson and other witnesses to show Johnson’s involvement with and use of drugs.” In
 
 Hobson v. State,
 
 730 So.2d 20, 26(¶ 19) (Miss.1998), the supreme court found that Hobson had attacked the witness on his credibility as a drug addict; therefore, the “trial court’s refusal to admit [the witness’s] prior convictions amounted to harmless error.”
 

 128. In his reply brief, Ross argues that
 
 Rogers
 
 and
 
 Hobson
 
 are distinguishable because in each case, the defense was afforded the opportunity to “extensively question” the witness on the extent and effect of his drug use. Ross’s counsel asked the trial court if he was allowed to question Sanders about his drug use and how it has affected his memory. The trial court stated that would be allowable. On cross-examination, Ross’s counsel asked Sanders two questions about his drug use. There was no objection from the State or restriction on the questioning by the trial court. Ross cannot complain that he was not afforded the opportunity to extensively question Sanders on the extent and effect of his drug use when his counsel simply failed to take full advantage of this opportunity. On redirect, the State questioned Sanders about the type of drugs he used, when he used drugs, how he developed his addiction, and any effect his drug use had on his ability to testify. The jury was well aware of Sanders’s drug use.
 

 129. Furthermore, Sanders testified at Ross’s first trial in 1997; at the time, Sanders did not have a drug problem or any felony convictions. If Sanders’s testimony at this trial differed from Ross’s first trial, Ross had the opportunity to impeach him with this prior testimony. Accordingly, we find that any error is harmless.
 

 B. Sheriff Gary Mauney
 

 130. Ross argues that under Rule 609, he should have been allowed to cross-examine Sheriff Mauney -with his prior drug conviction from the early 1970s. The State responds that Sheriff Mauney’s conviction was properly excluded because: (1) it was significantly more than ten years old and not proven to be probative, and (2) Ross did not provide the State with written notice of his intent to use this conviction.
 

 131. Rule 609(b) states:
 

 Time Limit. Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction,
 
 *410
 
 whichever is the later date, unless the court determines, in the interests of justice, that the probative value of the conviction supported by the specific facts and circumstances substantially outweighs its prejudicial effect. However, evidence of a conviction more than ten years old as calculated herein is not admissible unless the proponent gives to the adverse party sufficient advance written notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence.
 

 ¶ 32. Although the exact date of his conviction is not given, Sheriff Mau-ney’s conviction was over thirty years old at the time of trial; accordingly, his conviction was subject to the time limits of Rule 609(b). Ross failed to meet both requirements of Rule 609(b). First, he did not provide the State with advance, written notice of his intent to introduce Sheriff Mauney’s conviction. Next, he did not meet the threshold burden of showing the probative value of Sheriff Mauney’s prior conviction.
 
 McGee v. State,
 
 569 So.2d 1191, 1195 (Miss.1990). Ross’s counsel’s only argument for the introduction of the conviction was that “[i]t goes to Mr. Mau-ney’s credibility in this case.” If the party seeking to use the “antiquated conviction for impeachment purposes [does not] first demonstrate the probative value of the conviction by showing how the conviction suggests the witness is less than credible,” then “a trial court’s ruling to exclude evidence of a stale conviction will be upheld.”
 
 Vickers v. State,
 
 994 So.2d 200, 217(¶ 64) (Miss.Ct.App.2008) (internal citation omitted) Accordingly, we find that this issue lacks merit.
 

 C. Jen-y Clark
 

 ¶ 33. Ross argues that under Mississippi Rule of Evidence 609, he should have been allowed to cross-examine Clark with his forty-four-year-old kidnapping conviction. As with Sheriff Mauney, the State responds that Clark’s conviction was properly excluded because: (1) it was significantly more than ten years old and not proven to be probative, and (2) Ross did not provide the State with advance, written notice of his intent to use this conviction.
 

 ¶ 34. We analyze Clark’s conviction, just as we did Sheriff Mauney’s, under 609(b). Clark’s conviction was over forty years old at the time of trial, making it subject to the time limits of Rule 609(b). Again, Ross failed to meet both requirements of Rule 609(b). He provided no advance, written notice of his intent to introduce Clarks’s conviction, and he did not show the probative value of Clark’s prior conviction. Accordingly, we find that this issue lacks merit.
 

 D. Carolyn Whitehead
 

 ¶ 35. Ross argues that under Mississippi Rule of Evidence 609, he should have been allowed to cross-examine Carolyn Whitehead, his girlfriend at the time of the murder, with her prior conviction for burglary. The State responds that Whitehead’s conviction was properly excluded because there is insufficient information regarding the conviction, and it was at least ten years old.
 

 ¶ 36. Ross’s counsel did not provide the trial court with the date of the conviction or proof of the conviction. However, the prosecutor stated that he had been in the district for twelve years, and he had no knowledge of the conviction. Ross’s counsel did not respond to this representation. Accordingly, we proceed as though the conviction was more than twelve years old. As such, the conviction was subject to the time limits of Rule 609(b). Ross did not show the probative value of Whitehead’s
 
 *411
 
 prior conviction. Furthermore, we note that there is no indication in the record that Ross provided the State with advance, written notice of his intent to use this conviction as required under Rule 609(b). We find that this issue lacks merit.
 

 E. Dr. Steven Hayne
 

 ¶ 37. Ross argues that the trial court erroneously limited his voir dire and cross-examination of Dr. Steven Hayne about Dr. Hayne’s removal from the State of Mississippi’s list of approved pathologists. The State responds that Ross was allowed to extensively cross-examine Dr. Hayne on his qualifications and certifications.
 

 ¶ 38. “The qualifications of an expert in applicable fields of scientific knowledge is left to the sound discretion of the trial judge. His determination on this issue will not be reversed unless it clearly appears that the witness was not qualified.”
 
 Wilson v. State,
 
 574 So.2d 1324, 1334 (Miss.1990) (citing
 
 Smith v. State,
 
 530 So.2d 155, 162 (Miss.1988)).
 

 ¶ 39. “Since Mississippi’s adoption of the
 
 Daubert
 
 standard, Dr. Hayne has been found qualified to render expert testimony in the area of forensic pathology on numerous occasions by the courts of this [sjtate.”
 
 Williams v. State,
 
 964 So.2d 541, 547(¶ 25) (Miss.Ct.App.2007). Here, Hayne was questioned extensively about his qualifications and certifications by the State and Ross, and the trial court allowed Ross to proffer his evidence — that Dr. Hayne should not be considered an expert — before making its ruling.
 

 ¶ 40. In an effort to discredit Dr. Hayne as an expert, Ross wanted to question Dr. Hayne regarding the reason he was not allowed to perform autopsies for the state and about a report by Mississippi Commissioner of Public Safety Steve Simpson that criticized Dr. Hayne. The trial court stated that the probative value of Simpson’s opinion of Dr. Hayne’s office, which occurred in 2008, was outweighed by the fact that it was irrelevant to what happened in connection with a single autopsy in 1996. Accordingly, the trial court limited Ross to Dr. Hayne’s qualifications by training, education, and experience.
 

 ¶ 41. As the supreme court has stated, “[t]he scope of cross-examination, although ordinarily broad, is within the sound judicial discretion of the trial court and such court possesses an inherent power to limit such examination to relevant factual issues.”
 
 Dozier v. State,
 
 257 So.2d 857, 859 (Miss.1972). The trial court was within its discretion when it limited Ross’s cross-examination to the relevant issues of Dr. Hayne’s qualifications by training, education, and experience and excluded questioning about Simpson’s report.
 

 ¶ 42. Even if we find that the trial court erred, the restriction would constitute a harmless error on the part of the trial court. To warrant reversal on an issue, a party must show both error and a resulting injury.
 
 Catholic Diocese of Natchez-Jackson v. Jaquith,
 
 224 So.2d 216, 221 (Miss.1969). An error is only grounds for reversal if it affects the final result of the case.
 
 Id.
 
 Dr. Hayne was called to testify only as to the cause and manner of death, and Ross and the State agreed that there was no dispute about the cause or manner of death. On appeal, Ross does not show how he was injured by this undisputed testimony.
 

 ¶ 43. We find that the trial court acted within its discretion when it accepted Dr. Hayne as an expert in forensic pathology, particularly in light of the fact that there was no dispute by either party about Dr. Hayne’s opinion.
 

 F. Margaret Payne
 

 ¶ 44. Ross argues that he should have been allowed to impeach Payne with
 
 *412
 
 a prior inconsistent statement that she made to his investigator. The State argues that Payne did not deny making the inconsistent statement to Ross’s investigator, Herb Wells; therefore, it was not admissible into evidence.
 

 ¶ 45. “The standard of review regarding the admission or exclusion of evidence is abuse of discretion.”
 
 Yoste v. Wal-Mart Stores, Inc.,
 
 822 So.2d 935, 936(¶ 7) (Miss.2002). Unsworn prior inconsistent statements may be used to impeach a witness’s credibility. M.R.E. 613(b). Rule 613(b) provides:
 

 Extrinsic Evidence of Prior Inconsistent Statement of Witness. Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate him thereon, or the interests of justice otherwise require. This provision does not apply to admissions of a party-opponent as defined in Rule 801(d)(2).
 

 ¶ 46. First, we address Ross’s claim that this issue was addressed and decided by the supreme court in
 
 Ross I.
 
 The supreme court’s inquiry in
 
 Ross I
 
 about whether the admission of Payne’s statement about Yancey’s wallet does not address the issue before us. We must determine whether the trial court erred by refusing to admit Payne’s statement to Wells about what time Ross returned home based upon the requirements of Rule 613.
 

 ¶ 47. On direct examination, Payne testified that Ross arrived at Hale’s home at approximately 4:30 p.m., left between 8:00 p.m. and 8:30 p.m., and returned between 11:00 p.m. and 11:30 p.m. On cross-examination, Ross’s counsel asked Payne the following:
 

 All right. I know I beat that dead horse, but I[sic] to make sure I got it straight. Now, you said earlier in your testimony with Mr. Luther that [Ross] left Tommy Hale’s house around what time that evening? <0
 

 I would say about 4:30. »>
 

 He left or he got back at 4:30? <o
 

 He left about 4:30.
 

 He left at 4:30, 4:30 p.m. that day; is that right? <o
 

 Right. ►>
 

 Okay, and what time did he return that day? ¿O
 

 That night.
 

 What time?
 

 11:00,11:30.
 

 [[Image here]]
 

 Q: And didn’t come back any in between, right?
 

 A: I don’t believe so.
 

 [[Image here]]
 

 Q: Isn’t it true that you have told people previously to this day that Charles Ross came back to Tommy Hale’s trailer that night between 8:30 and 9:00 p.m.?
 

 A: Not that I remember.
 

 [[Image here]]
 

 Q: ... do you remember telling [Herb Wells] that Charles Ross came back that night between 8:30 and 9:00 p.m.?
 

 A: I might a did. It’s been a long time.
 

 Q: Right. Again, you’re not disputing the fact that you told him that. You just don’t remember it, do you?
 

 A: I don’t remember.
 

 ¶ 48. Following this testimony, Ross asked that Wells be allowed to testify about “the contradiction of the testimony that [Payne] gave.” The trial court ruled
 
 *413
 
 that under Mississippi Rule of Evidence 613(b), the witness must be afforded the opportunity to explain or deny the prior inconsistent statement. Payne was called to testify again.
 

 ¶ 49. Initially, she testified that she remembered talking to Wells, but she repeatedly stated that she did not remember telling him that Ross returned to the trailer at 8:30 p.m. or 9:00 p.m. Payne admitted that her testimony was inconsistent with her prior statement. After reviewing her previous statement, Ross’s counsel asked Payne the following:
 

 Q: So you’re admitting that you’ve given two different statements about that, right?
 

 A: I guess if it’s there, I did.
 

 Q: Why did you give a different statement on September 10, 1997[,] than you gave at 4:30 today?
 

 A: When things is going on like that, it’s not easy to remember.
 

 ¶ 50. After Ross’s counsel read Payne’s prior statement to her and she had an opportunity to review it herself, Payne admitted that if it was in the statement; then she said it. She stated that it was not easy to remember these kind of details. We find that Ross’s claim fails because Payne admitted making the prior inconsistent statements.
 

 ¶ 51. Once a witness explains a prior inconsistent statement by admitting it, extrinsic evidence of the statement cannot be admitted into evidence.
 
 Shelton v. State,
 
 728 So.2d 105, 115(¶ 47) (Miss.Ct.App.1998).
 

 ¶ 52. Furthermore, we note that the record indicates that Ross impeached Payne with her prior inconsistent statement under Rule 613(a), which allows a party to “[read] the statement to the witness and [ask] whether that statement accurately reflects the testimony given on the occasion when the statement was recorded.”
 
 Everett v. State,
 
 835 So.2d 118, 120(¶ 16) (Miss.Ct.App.2003). Ross’s counsel read Payne’s prior statement to her and questioned her about whether she said this, why she said it, and why the statement differed from her trial testimony. Accordingly, this issue has no merit.
 

 2. Was Ross prejudiced by testimony regarding his bad character and a prior conviction?
 

 ¶ 53. Ross claims he was prejudiced by (1) Payne’s testimony that Ross said that he wished that he had kept the gun, the murder weapon, so he could kill the man who had killed their sister, and (2) Sanders’s testimony that Ross previously was in prison.
 

 ¶ 54. Character evidence is not admissible to prove that one acted in conformity therewith. M.R.E. 404(a). Evidence of another crime or prior bad act is not usually admissible.
 
 Ballenger v. State,
 
 667 So.2d 1242, 1256 (Miss.1995). However, according to Rule 404(b), evidence of other crimes or bad acts may be admissible to prove identity, knowledge, intent, or motive or to prove scienter.
 
 Simmons v. State,
 
 813 So.2d 710, 716(¶ 30) (Miss.2002) (citations omitted).
 

 A. The Gun
 

 ¶ 55. Ross argues that the State elicited information about his bad character—his statement that he wanted to kill the man who had killed his sister, and he was prejudiced by this information. The State responds that Ross is procedurally barred from making this argument because he failed to object. We agree.
 

 ¶ 56. Failure to make a contemporaneous objection waives an issue for purposes of appeal.
 
 Spicer v. State,
 
 921 So.2d 292, 305(¶ 22) (Miss.2006) (citing
 
 *414
 

 Williams v. State,
 
 684 So.2d 1179, 1203 (Miss.1996)).
 

 ¶ 57. During its direct examination of Payne, the State asked her the following:
 

 Q: Who was Dennis Chapman?
 

 A: He killed my sister. That’s the best—
 

 Q: A long time ago?
 

 A: In '82 I think if I ain’t mistaken. He shot and killed my sister.
 

 Q: And got prosecuted for that, right?
 

 A: Yeah.
 

 Q: Did you hear anything about Dennis Chapman?
 

 BY MR. TANNEHILL: Objection. I don’t mind him leading the witness to speed up things. I object to the form of the question as leading.
 

 BY MR. LUTHER: Your Honor, I’ll rephrase the question.
 

 BY THE COURT: All right.
 

 Q: What, if anything, else did Charles Ross say that night before you went to bed?
 

 A: That he wished he hadn’t threw [sic] the gun away to, you know, kill Dennis; but he said that was fine. He would get him another gun.
 

 Q: Did he have an issue with Dennis Chapman?
 

 BY MR. TANNEHILL: I’m going to object. It calls for her to speculate.
 

 BY THE COURT: Overruled.
 

 Q: Had Charles ever expressed any hard feelings towards Dennis Chapman?
 

 A: Oh, yeah.
 

 Q: He killed his sister?
 

 A: Yeah.
 

 ¶58. In his reply brief, Ross claims that he did object to the State’s questioning and that his objections were obvious— the testimony was inadmissable as evidence of bad character. In
 
 Murphy v. State,
 
 453 So.2d 1290, 1293 (Miss.1984), the supreme court held that the defendant was not procedurally barred from arguing that testimony was inadmissable even though the grounds for the objection were not stated because “it [was] obvious from the response of the prosecutor and the ruling of the trial judge, as well as the totality of the setting in which these objections were interposed, that everyone clearly understood that the objection was based upon the hearsay rule.”
 

 ¶ 59. Unlike the defense counsel in
 
 Murphy,
 
 Ross’s counsel clearly stated the bases for his objections — the State was leading and calling for a witness to speculate. Each of these objections and their bases was considered by the trial court. “An objection at trial on one or more specific grounds constitutes a waiver of all other grounds.”
 
 Spicer,
 
 921 So.2d at 305(¶ 22) (citing
 
 Doss v. State,
 
 709 So.2d 369, 379 (Miss.1996)). Ross’s counsel stated his grounds for objection and waived all other grounds. This issue lacks merit.
 

 B. Ross’s Incarceration
 

 ¶ 60. Ross claims that Sanders’s testimony that Ross previously was incarcerated was so prejudicial that any reference to his prior conviction could not have been mitigated by any admonishment to the jury. Accordingly, Ross contends that the trial court erred by denying his motion for a mistrial.
 

 ¶ 61. The standard of review for a denial of a motion for mistrial is abuse of discretion.
 
 Caston v. State,
 
 823 So.2d 473, 492(¶ 54) (Miss.2002).
 

 ¶ 62. On direct examination, Sanders testified that he had worked on Ross’s Mercury Cougar and had broken one of its taillights when he was trying to push the
 
 *415
 
 car on a ramp. On cross-examination, the defense asked Sanders the following:
 

 Q: You also testified earlier, I thought I heard you say, that you were moving the car and doing some work on it, right?
 

 A: Yes, sir; but this was — back when I was messing with it, he was still in prison.
 

 BY MR. TANNEHILL: Objection, Your Honor. May we approach?
 

 BY THE COURT: All right.
 

 Following a discussion off the record, Mr. J. Rhea Tannehill, attorney for the defendant proceeded to cross-examine Sanders.
 

 ¶ 63. At the next break, the defense asked for a mistrial based upon Sanders’s testimony. The State responded that “the same questions were asked in [Ross’s] first trial; and [Ross] got the same exact response anyway. It’s sort of, I don’t know how you can go back and ask the same question and not expect the same answer.” The State also pointed out that the defense could have taken precautions to ensure that Sanders did not mention Ross’s prior incarceration. The trial court stated that:
 

 The record needs to reflect that the defendant’s counsel did make a contemporaneous objection at the bench, which we did not put on the record; and part of the reason was because I didn’t want to create a bigger stir than the defense attorney wanted to be created, in other words, make a big to do out of it at the time, left the option to defense counsel to take steps at that time if he wished to or wait until we take a break; and the record needs to reflect that he did make a contemporaneous objection and reserved the right to request leave on the first break.
 

 [I am] denying the motion for mistrial.
 

 ¶ 64. The record is silent on the trial court’s ruling regarding Ross’s counsel’s objection to Sanders’s testimony. The State did not follow up on this line of questioning on redirect as would be expected if the trial court had ruled that this evidence was admissible. We proceed as though the trial court sustained the objection.
 

 ¶ 65. In
 
 Osborne v. State,
 
 843 So.2d 99, 101(¶ 5) (Miss.Ct.App.2003), this Court stated:
 

 “Case law unequivocally holds that the trial judge ‘is in the best position for determining the prejudicial effect’ of an objectionable comment.”
 
 Alexander v. State,
 
 602 So.2d 1180, 1182 (Miss.1992). The trial judge is vested with discretion to determine whether a comment is so prejudicial that a mistrial should be declared.
 
 Edmond v. State,
 
 312 So.2d 702, 705 (Miss.1975). Absent “serious and irreparable damage,” the trial judge should request the jury to disregard the improper statement and deny any motion for a mistrial.
 
 Roundtree v. State,
 
 568 So.2d 1173, 1178 (Miss.1990). “It is well settled that when the trial judge sustains an objection to testimony and he directs the jury to disregard it, prejudicial error does not result.”
 
 Estes v. State,
 
 533 So.2d 437, 439 (Miss.1988). We presume that the jurors will follow the instructions given by the court.
 
 Payne v. State,
 
 462 So.2d 902, 904 (Miss.1984). “To presume otherwise would be to render the jury system inoperable.”
 
 Johnson v. State,
 
 475 So.2d 1136, 1142 (Miss.1985).
 

 ¶ 66. Here, Ross did not ask for a limiting instruction; therefore, the inquiry becomes whether the trial court should have admonished the jury sua sponte. “As a general rule, it is presumed that when the trial judge sustains objee-tions[,] the jury understands that the trial court disapproves of the testimony or inquiry in question.”
 
 Davis v. State,
 
 472
 
 *416
 
 So.2d 428, 433 (Miss.1985) (citation omitted). “In many instances a limiting instruction from the bench can actually focus a jury’s attention on the sensitive testimony.”
 
 Brown v. State,
 
 890 So.2d 901, 913(1135) (Miss.2004). “The burden should properly be upon the trial counsel to request a limiting instruction.”
 
 Id.
 
 at (¶ 36).
 

 ¶ 67. The trial court’s comments indicate that Ross’s counsel did not want to draw attention to Ross’s incarceration by making his objection in front of the jury. It follows that he did not ask the trial court to admonish the jury about this statement because it would draw additional attention to it.
 

 ¶ 68. Furthermore, it appears that Ross’s counsel could have anticipated Sanders’s response to this line of questioning, because, according to the State, Sanders gave the same response in the first trial. We can find no error on the part of the trial court in denying the motion for mistrial.
 

 3. Is the verdict supported by the weight of the evidence ?
 

 ¶ 69. Ross claims that the jury’s guilty verdict is against the overwhelming weight of the evidence. He argues that there is evidence that Payne and Sanders were involved in Yancey’s death.
 

 ¶ 70. “When reviewing a denial of a motion for a new trial based on an objection to the weight of the evidence, we will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.”
 
 Bush v. State,
 
 895 So.2d 836, 844(¶ 18) (Miss.2005). The evidence is weighed in the light most favorable to the verdict.
 
 Id.
 
 The power to grant a new trial should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict.
 
 Id.
 
 If the verdict is against the overwhelming weight of the evidence, the proper remedy is to grant a new trial.
 
 Id.
 

 ¶ 71. Ross claims that his confession to Payne does not satisfy the State’s burden to prove a corpus delicti. Corpus delicti is defined as the body or substance of the crime, which:
 

 contains the following two elements which must be proved beyond a reasonable doubt in order to show that a crime has actually been committed:
 

 (1) the existence of a certain act or result forming the basis of a criminal charge and (2) the existence of criminal agency as the cause of this act or result.
 

 [[Image here]]
 

 In order to reduce the risk of a defendant being convicted of a crime never committed, this court requires independent proof of corpus delicti beyond extrajudicial admissions or confessions. The corpus delicti need only be proven by a preponderance of the evidence, and the confession may be used to raise the proof beyond a reasonable doubt.
 

 Cotton v. State,
 
 675 So.2d 308, 313 (Miss.1996) (citations omitted).
 

 ¶ 72. Ross’s argument is unfounded and meritless. There is no question that a crime was committed; Yancey was robbed and died as a result of being shot four times.
 

 ¶ 73. Ross claims that without Payne’s testimony that none of the State’s evidence proves he was involved in Yancey’s murder. However, Ross confessed to three people in addition to Payne.
 

 ¶ 74. Clark testified that after an altercation with his wife, he was jailed overnight with Ross. Clark and Ross knew each other prior to being jailed together. Ross told Clark, “[Clark], I shot a man for $1.” Clark stated that Ross told him he
 
 *417
 
 was high on crack and drinking when he shot the man in the head.
 

 ¶ 75. April Chapman (“April”) testified that she went with her mother to visit Ross in prison. April’s mother and Ross had a previous relationship. April testified that Ross told her and her mother that the “gun had been stolen out of the police department; and that he had killed Ray Yancey; and that he knew he was going to get away with it because the evidence was gone.” While weapons had been stolen from the evidence room at the police station, the alleged murder weapon was not one of the guns that were stolen.
 

 ¶ 76. Whitehead, Ross’s girlfriend at the time of the murder, testified that Ross asked her to meet him one Saturday morning at a convenience store, but she could not remember when this was. Whitehead stated that Ross said he was in trouble and that he had killed a man.
 

 ¶ 77. Marie and Grey both testified that a loud car traveled up and down their road around 9:30 p.m. on the night of the murder. Numerous people testified that Ross’s car was loud because it did not have a muffler. Grey testified that the car was dark, like Ross’s Mercury Cougar.
 

 ¶ 78. Yancey’s television and VCR were found at Hale’s home, and Hale and Payne testified that Ross brought the electronics into the home. Yancey’s daughter was able to provide a serial number for the television that proved it belonged to Yan-cey.
 

 ¶ 79. We find that the verdict is not against the overwhelming weight of the evidence, and allowing the verdict to stand does not result in an unconscionable injustice. Thus, this issue has no merit.
 

 A
 
 Did the cumulative effect of the trial court’s errors on the admissibility of evidence render his trial unfair?
 

 ¶80. Ross argues that the trial court erred by allowing inadmissible hearsay and irrelevant evidence. Ross claims that there was not overwhelming evidence against him; therefore, we should view the cumulative errors as prejudicial. The State claims that the trial court did not commit errors when it allowed the testimony and evidence at issue; therefore, there can be no cumulative error.
 

 ¶ 81. The standard of review we employ regarding the admissibility of evidence is well settled: “a trial judge enjoys a great deal of discretion as to the relevancy and admissibility of evidence. Unless the judge abuses this discretion so as to be prejudicial to the accused, the [appellate court] will not reverse this ruling.”
 
 Robinson v. State,
 
 940 So.2d 235, 238(¶ 7) (Miss.2006) (quoting
 
 Turner v. State,
 
 732 So.2d 937, 946(¶ 31) (Miss.1999)).
 

 A. Yancey’s Identification Card
 

 ¶ 82. Payne testified that when Ross showed her the wallet, she saw an identification card bearing Yancey’s name. Investigator Steve Wilburn testified that he had Yancey’s identification card reproduced at Costume World. The State asked Investigator Wilburn the following regarding Costume World and the identification card:
 

 Q: Did you go there? What did you find out when you got there?
 

 A: I asked some of the people working there if, in fact, they did make photo I.D.’s; and they informed me that they did.
 

 BY MR. TANNEHILL: Your Honor, again I’m going to object to the hearsay as to what anybody else told Mr. Wilburn.
 

 BY THE COURT: All right.
 

 The trial court did not overrule Ross’s counsel’s objection, and Investigator Wil
 
 *418
 
 burn did not testify further about what anyone else told him.
 

 ¶ 83. Ross’s next objection came when the State asked Investigator Wilburn:
 

 Q: Do you know Hershell Ray Yan-cey’s mother, Marie Yancey?
 

 A: I did interview her at one time.
 

 Q: She indicated to you that this was the same—
 

 BY MR. TANNEHILL: Your Honor, again I’m going to object to the hearsay as to what anybody else told Mr. Wilburn.
 

 BY THE COURT: All right. Sustained.
 

 Both of Ross’s counsel’s objections were sustained, and neither related to the identification card itself as hearsay, as Ross argues on appeal. “An objection at trial on one or more specific grounds constitutes a waiver of all other grounds.”
 
 Spicer,
 
 921 So.2d at 305(¶ 22). Furthermore, the identification card was never introduced as evidence. This issue is without merit.
 

 B. Testimony about Yancey’s Television, VCR and Wallet
 

 ¶ 84. Ross claims that it was error for an investigator to testify that Yan-cey’s estranged wife told the investigator that Yancey’s television, VCR, and wallet were missing from the home. Ross’s counsel objected to the testimony as hearsay. The State responded that the question was “asked on the initial scene of a crime as part of his investigation, Is there anything missing? Your Honor, I think that would be considered an exception to the hearsay [rule].” The objection was overruled.
 

 ¶ 85. We find that any error in the admission of the Yancey’s estranged wife’s statement was harmless error. The supreme court has held that:
 

 The basic test for harmless error in the federal constitutional realm ... is whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained .... [T]he inquiry is not whether the jury considered the improper evidence or law at all, but rather, whether that error was unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.
 

 Thomas v. State,
 
 711 So.2d 867, 872-73(¶ 25) (Miss.1998) (internal citations and quotations omitted).
 

 ¶ 86. Without objection, multiple witnesses testified that Yancey’s television, VCR, and wallet were missing from his home. Investigator Wilburn testified that Yancey’s television and VCR were recovered from Hale’s house. The television’s serial number confirmed that the television belonged to Yancey. Yancey’s daughter, Carol Brown, testified that she had purchased the television and VCR recovered from Hale’s house for her father. Deputy Sheriff Wayne Wilbanks testified that there was a table in Yancey’s living room where you would expect a television to be that had a clean mark, as if something had just been moved. Payne testified that she saw Ross with Yancey’s wallet.
 

 ¶ 87. The State did not show that Yan-cey’s estranged wife’s statement was admissible as an exception to the rule against hearsay; however, we find that this error was harmless when compared to all of the other evidence considered by the jury.
 

 C. Alleged Irrelevant Evidence
 

 ¶ 88. Ross argues that the trial court erred by admitting into evidence pieces of a taillight found in Yancey’s driveway, ashes collected from Hale’s grill, the .22-cali-ber pistol recovered behind Hale’s home,
 
 *419
 
 and Yancey’s identification card, because they were all irrelevant evidence.
 

 ¶ 89. “ ‘Relevant Evidence’ means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.” M.R.E. 401.
 

 ¶ 90. First, we address pieces of a taillight found in Yancey’s driveway that were compared to the taillight in Ross’s car. Sanders testified that he had previously broken Ross’s taillight when he was working on his car. To disguise the damage, Sanders painted the housing red. The State presented pictures of Ross’s car to Sanders, and Sanders testified that the picture “show[ed] the car with the taillight broken out, but [that there was] one piece missing that [he] didn’t break out.” He explained that there was a piece on the end of the housing that was broken out but that was not painted red, so it must have been broken after he had broken the taillight.
 

 ¶ 91. Joseph Kellum, a forensic scientist with the Mississippi Crime Laboratory, testified that he analyzed the pieces of taillight from Yancey’s driveway and from Ross’s car and found that they were similar in color and physical design. They also shared the same rectangular pattern—dimension, length, and width. Kellum testified that he compared the pieces from Yancey’s driveway and Ross’s taillight by using a FTIF microscope and performing a pyrolysis GC chemical analysis and concluded that the physical properties of the pieces were consistent with one another. Although not conclusive evidence that Ross was the perpetrator, the taillight analysis shows that Ross’s taillight’s composition is consistent with the evidence of the broken taillight found at Yancey’s home. Furthermore, Sanders’s testimony shows that the taillight was broken again after he had broken it. The trial court did not abuse its discretion when it admitted this evidence.
 

 ¶ 92. Second, we address Ross’s argument that the .22-caliber pistol should not have been introduced because it was irrelevant. Ross does not attempt to explain or expound upon this argument.
 

 ¶ 93. The projectiles recovered from Yancey’s body were identified as .22-cali-ber. Payne testified that after confessing to shooting Yancey with the gun, Ross threw a .22-caliber pistol behind Hale’s trailer, and the police recovered Hale’s .22-caliber pistol from behind Hale’s trailer. John Franovich with the Mississippi Crime Laboratory testified that the projectiles he fired from the .22-caliber pistol and the projectiles recovered from Yancey bore some similarities and common class characteristics. Neither projectile had a definitive land and groove pattern that Franovich would have expected from a rifle or pistol.
 

 ¶ 94. We find that the trial court did not err when it allowed the .22-caliber pistol into evidence. Payne testified that after Ross confessed to her that he had shot a man, he threw the gun down the hill. The gun was recovered where Payne said Ross had thrown it, and it had characteristics that were consistent with the characteristics of the projectiles recovered from Yancey’s body.
 

 ¶ 95. Third, Ross claims that the introduction of the bag of ashes from Hale’s grill was erroneously admitted. Payne testified that on the night of the murder, Ross showed her the wallet before he set fire to it in Hale’s grill. Deputy Sheriff Wilbanks testified the contents in Hale’s grill had fragments and parts in the shape of a billfold or what he thought to be a billfold. However, twelve years after the murder, Deputy Sheriff Wilbanks stated
 
 *420
 
 that he could not identify the contents collected from the grill as a billfold. However, at the earlier trial Deputy Sheriff Wilbanks had identified the grill contents as a billfold. We fail to see how this admission prejudiced Ross. The trial court did not err when it gave Deputy Sheriff Wilbanks the opportunity to identify the contents of the grill, in spite of the fact that at trial, he was unable to characterize them as more than ashes.
 

 ¶ 96. Last, we address Ross’s claim that the reproduced identification card should have been excluded as irrelevant evidence. As we have already discussed, Yancey’s identification card was never introduced into evidence and, accordingly, was not admitted into evidence. Thus, this assignment of error lacks merit.
 

 ¶ 97. We have found that each of Ross’s assignments of error is without merit. “As there was no reversible error in any part, so there is no reversible error to the whole.”
 
 McFee v. State,
 
 511 So.2d 130, 136 (Miss.1987).
 

 5.
 
 Was
 
 Ross’s expert witness erroneously excluded?
 

 ¶ 98. Ross claims that he was denied the right to put on his defense because the trial court refused to allow his expert on criminal investigations to testify. The State argues that Ross is procedurally barred from raising this issue on appeal because he failed to raise it in his motion for a new trial.
 

 ¶ 99. ‘Where an assignment of error is evidenced in the pleadings and transcript, it is not necessary to make a motion for a new trial based upon that error.”
 
 Underwood v. State,
 
 708 So.2d 18, 26(¶ 22) (Miss.1998) (citing
 
 Jackson v. State,
 
 423 So.2d 129, 131 (Miss.1982)). Here, Ross preserved this issue for appeal by offering Wells’s proffered testimony and qualifications to the trial court. The trial court ensured that Ross was afforded the opportunity to make his ease on the record that Wells should be allowed to testify as an expert. Accordingly, we address this issue on the merits.
 

 ¶ 100. “The admission of expert testimony is addressed to the sound discretion of the trial judge.”
 
 Roberts v. Grafe Auto Co.,
 
 701 So.2d 1093, 1098 (Miss.1997). In
 
 Ross I,
 
 the supreme court addressed Wells’s proffered testimony about criminal investigations, as well as other matters, and stated:
 

 The admissibility of expert testimony is evaluated in light of M.R.E. 702, which holds that such testimony may be introduced when it is found to be relevant and reliable.
 
 See Miss. Transp. Comm’n v. McLemore,
 
 863 So.2d 31, 38 (Miss.2003);
 
 see also
 
 M.R.E. 702. Testimony is relevant if it will assist the trier of fact in understanding or determining a fact at issue.
 
 Id.
 
 To meet the requirement of reliability, an expert’s testimony must be based on the methods and procedures of science, and not merely on subjective beliefs or unsupported speculation.
 
 Id.
 
 at 36 (citing
 
 Daubert v. Merrell Dow Pharms., Inc.,
 
 509 U.S. 579, 587, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)). Rule 702 expressly allows expert testimony regarding non-scientific matters, so long as the witness’s knowledge, skill, experience, training, or education qualify him as an expert in a given field, and (1) the testimony is based upon sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has applied the principles and methods reliably to the facts of the case.
 

 Ross I,
 
 954 So.2d at 996-97(¶ 57).
 

 ¶ 101. Ross submitted Wells as an expert in criminal investigations. Wells worked as a police officer and on an inves
 
 *421
 
 tigative task force focused on major and organized crime, attended numerous seminars on crime scene investigation, and helped set up the first narcotic unit in northeast Mississippi. He has worked as a private investigator since the mid 1980s. The State argued that expert testimony was not appropriate because Ross’s counsel could cross-examine the witnesses on these matter. The trial court acknowledged that the supreme court had implied in
 
 Ross I
 
 that the
 
 Daubert
 
 factors can be considered in the field of criminal investigations.
 

 ¶ 102. The trial court ruled that Wells should not be permitted to testify. The judge found the investigation of the crime scene had been adequately covered, and the officers had been subject to vigorous cross-examination about their techniques. The officers agreed that things could have been handled better; therefore, the trial court found Wells’s testimony would only bolster the officers’ testimonies and not be probative.
 

 ¶ 103. The trial court also found that many of Wells’s memberships and associations were voluntary and fee based, not peer reviewed or tested. Furthermore, the trial court was unable to evaluate the value of Wells’s certifications because the trial court was unaware of the requirements for certification.
 

 ¶ 104. Wells was prepared to testify that the officers were deficient in their investigation into Yancey’s murder. However, we find that the trial court did not abuse its discretion when it found Wells’s proffered testimony had been adequately covered by the cross-examination of the officers and that Wells had failed to establish the reliability of his testimony under
 
 Daubert.
 
 Consequently, the trial court did not err in excluding Wells’s testimony.
 

 6. Did the trial court err when it refused to suppress evidence gathered from, Ross’s car in a warrantless automobile search?
 

 ¶ 105. Ross argues that evidence seized from his Mercury Cougar was the product of an illegal search and seizure. The State argues the supreme court’s holding in
 
 Ross I
 
 that this evidence was constitutionally acquired and is binding.
 

 ¶ 106. ‘When reviewing a trial court’s ruling on the admission or suppression of evidence, [the appellate court] must assess whether there was substantial credible evidence to support the trial court’s findings.”
 
 Culp v. State,
 
 933 So.2d 264, 274(¶ 26) (Miss.2005). “The admission of evidence lies within the discretion of the trial court and will be reversed only if that discretion is abused.”
 
 Id.
 

 ¶ 107. In his first appeal, as here, Ross argued that the warrantless search of his car did not fall under the “automobile exception” to the Fourth Amendment to the United States Constitution or the “plain-view” exception to the Fourth Amendment.
 

 ¶ 108. While searching for Ross, the police found his car at his brother’s, Donald, Sr., house.
 
 Ross I,
 
 954 So.2d at 995(¶ 52). The police discovered that the tag on the car had been switched.
 
 Id.
 
 Donald, Sr. granted the police permission to search the premises.
 
 Id.
 
 “The police noted that the vehicle had a broken taillight and that there were several beer cans, similar to those found at the crime scene, on the floorboard, and had the car towed to the sheriffs office.”
 
 Id.
 
 “The trial court conducted a hearing on the admissibility of the beer cans and found that, because the car’s tag had been switched, the car was in plain view, and the officers had consent to search the
 
 *422
 
 premises, there was no constitutional violation.”
 
 Id.
 

 ¶ 109. The supreme court held that:
 

 A renter such as Don Ross, Sr. has been recognized as possessing sufficient authority to consent to a search of the premises.
 
 Hudson v. State,
 
 475 So.2d 156, 158 (Miss.1985). Ross had no ownership interest in the premises and therefore cannot argue that any expectation of privacy was violated.
 
 Compare Scott v. State,
 
 266 So.2d 567, 569 (Miss.1972) (“[W]here the proof shows that a person is renting a room or is in possession of a room in a house or an apartment under such circumstances as to make such person the owner thereof for the time being, such person is entitled to the protection afforded by Section 23 of the Constitution.”). Because Don Ross, Sr. consented to a search of his premises, evidence collected pursuant to that consent was constitutionally acquired. This assignment of error is without merit.
 

 Id.
 
 at 995-96(¶ 54).
 

 ¶ 110. At his second trial, the trial court heard Ross’s motion to suppress the evidence as the product of an illegal search and seizure. The trial court ruled:
 

 This was an issue that was passed on by the [s]upreme [cjourt and they [focused] principally on the issue of consent as stated. I believe that it’s highly unlikely that the facts that gave rise to their ruling are likely to differ significaney in the retrial of this case. So I believe that it’s almost crystal clear that this issue has been resolved in the previous trial and affirmed by the [sjupreme [c]ourt as to the search and seizure of these items. The court won’t revisit that unless there is some different factual scenarios significant enough to warrant that.
 

 During the trial, Ross’s counsel renewed his objection to evidence collected from Ross’s car. The trial court stated that if the defense had a proffer about different facts, then he should make it at that moment. If not, the motion for a hearing outside the presence of the jury was denied. Ross’s counsel stated that he was not aware of any different facts.
 

 ¶ 111. We find that the trial court correctly denied the motion to suppress. The supreme court has explained that:
 

 The doctrine of the law of the case is similar to that of former adjudication, relates entirely to questions of law, and is confined in its operation to subsequent proceedings in the case. Whatever is once established as the controlling legal rule of decision, between the same parties in the same case, continues to be the law of the case, so long as there is a similarity of facts. This principle expresses the practice of courts generally to refuse to reopen what has previously been decided. It is founded on public policy and the interests of orderly and consistent judicial procedure.
 

 Mauck v. Columbus Hotel Co.,
 
 741 So.2d 259, 266-67(¶ 22) (Miss.1999) quoting
 
 TXG Intrastate Pipeline Co. v. Grossnickle,
 
 716 So.2d 991, 1019(¶ 97) (Miss.1997).
 

 ¶ 112. During the hearing on Ross’s motion to suppress, the trial court invited Ross to come forward with any additional evidence that would warrant a different outcome. However, none was presented to the trial court.
 

 ¶ 113. Ross also argues that the holding in
 
 Ross I
 
 is contrary to Mississippi precedent that “[c]onsent to search voluntarily given without coercion may be given by a third party who possessed common authority, mutual use and joint control over property not in the exclusive control or possession of the defendant and where the defendant had no reasonable expectation of privacy,” because Donald, Sr. did
 
 *423
 
 not have dominion over the Mercury Cougar.
 
 Mettetal v. State,
 
 615 So.2d 600, 603 (Miss.1993). However, in
 
 Ross I,
 
 the supreme court stated that “[c]onsent to search may be provided by a third party who possesses common authority over or other sufficient relationship to the premises or effects sought to be inspected.”
 
 Ross I,
 
 954 So.2d at 996(¶ 54). The correct standard was applied in
 
 Ross I.
 
 Any argument Ross wished to make regarding Donald, Sr.’s dominion over the Mercury Cougar should have been presented to the trial court. This issue is without merit.
 

 7. Did the trial court err when it refused jury instruction D-6?
 

 ¶ 114. Ross alleges in his first assignment of error that the trial court erred by refusing his instruction on witness demeanor and conflicting testimony. The State responds that the trial court covered the credibility of witnesses elsewhere with another instruction.
 

 ¶ 115. “Whether to give a jury instruction is within the sound discretion of the trial court.”
 
 Chamberlin v. State,
 
 989 So.2d 320, 341-12(¶ 80) (Miss.2008) (citation omitted). We review the jury instructions given as a whole to determine whether the refusal of a particular instruction was in error.
 
 Taylor v. State,
 
 763 So.2d 913, 915(¶ 8) (Miss.Ct.App.2000). If the instructions fairly state the law of the case and no injustice is created, no reversible error will be found.
 
 Id. “A
 
 defendant is entitled to have jury instructions given which present his theory of the case[;] however, this entitlement is limited in that the court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence.”
 
 Poole v. State,
 
 826 So.2d 1222, 1230(¶ 27) (Miss.2002) (quoting
 
 Smith v. State,
 
 802 So.2d 82, 88(¶ 20) (Miss.2001)).
 

 ¶ 116. Ross offered instruction D-6 which states:
 

 Each person testifying under oath is a witness. You have the duty to determine the believability of the witnesses. In performing this duty, you must consider each witnesses] intelligence, the witnesses] ability to observe and accurately remember, the witnesses] sincerity, and the witnesses] demeanor while testifying. You must consider also the extent the witness is either supported or contradicted by other evidence; the relationship the witness may have with either side; and how the witness might be affected by the verdict.
 

 In weighing a discrepancy by a witness or between witnesses, you should consider whether it resulted from an innocent mistake or deliberate falsehood.
 

 You may reject or accept all or any parts of a witnesses] testimony and you may reject part and accept other parts of a witness’ testimony. After making [your] own judgment, you will give the testimony of each witness the credibility, if any, as you may think it deserves.
 

 Ross submitted instruction D-6, and the State responded that “it’s more than adequately covered by the State’s instructions.” The State admits that its instructions did not cover witness demeanor and conflicting testimony; however, the State claims that the trial court’s instruction C-l addressed those matters. The trial court instruction C-l states:
 

 You are the sole judges of the facts in this case. Your exclusive province is to determine what weight and what credibility will be assigned the testimony and support of each witness. You are required and expected to use your good common sense and sound honest judgment in considering and weighing the testimony of each witness who has testified.
 

 
 *424
 
 ¶ 117. Ross argues that even if his instruction was covered in instruction C-l, under
 
 Chatman v. State,
 
 761 So.2d 851 (Miss.2000), he is entitled to a more detailed instruction because witness credibility was an issue in this case. We disagree. In
 
 Chatman,
 
 the supreme court found that the defendant failed to prove that his proposed instruction was not substantially covered in the jury charges as a whole
 
 and
 
 that witness credibility was of such importance that the court’s failure to instruct the jury on that issue seriously impaired the defendant’s ability to present his given defense.
 
 Id.
 
 at 855(¶ 17). A defendant must show “that his requested instruction was (1) a correct statement of the law, (2) not substantially covered in the jury charges as a whole, and (3) of such importance that the court’s failure to instruct the jury on that issue seriously impaired the defendant’s ability to present his given defense.”
 
 Id.
 
 at 854-55(¶ 15) (citations omitted).
 

 ¶ 118. We have reviewed instruction D-6, which was requested by Ross and refused by the trial court, and find it is fairly covered by instruction C-l, which was given.
 
 See Randolph v. State,
 
 924 So.2d 636, 642 (¶¶ 18-19) (Miss.Ct.App.2006). It is well-settled law that all jury instructions are to be read together, and if the jury is fully and fairly instructed by other instructions, the refusal of any similar instruction does not constitute reversible error.
 
 Rester v. Lott,
 
 566 So.2d 1266, 1269 (Miss.1990). Having reviewed the instructions of the trial court to the jury, we find that they accurately and sufficiently guided the jury in its deliberations. Accordingly, this issue is without merit.
 

 ¶ 119. THE JUDGMENT OF THE TIPPAH COUNTY CIRCUIT COURT OF CONVICTION OF CAPITAL MURDER AND SENTENCE AS A HABITUAL OFFENDER OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITHOUT ELIGIBILITY FOR PAROLE OR EARLY RELEASE, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO TIPPAH COUNTY.
 

 KING, C.J., LEE AND MYERS, P.JJ., IRVING, BARNES, ISHEE, ROBERTS, CARLTON AND MAXWELL, JJ., CONCUR.